UNITED STATES, Appellee,

v.

Spencer I. JORDAN, Airman, U.S.
Navy, Appellant.

No. 58,976.
NMCM 86 1006.

U.S. Court of Military Appeals.

Sept. 28, 1989.

For Appellant: *Lieutenant John L. Staley, JAGC, USNR* (argued); *Lieutenant Commander Robert J. Smith, JAGC, USN* and *Lieutenant Deborah D. Sorkin, JAGC, USNR.*

For Appellee: *Lieutenant Commander L. Friedman, JAGC, USN* (argued); *Captain Wendell A. Kjos, JAGC, USN* (on brief).

### Opinion

COX, Judge:

Contrary to his pleas, appellant stands convicted of conspiracy to commit robbery, robbery, and murder while engaged in the perpetration of robbery, in violation of Articles 81, 122, and 118, Uniform Code of Military Justice, 10 USC §§ 881, 922, and 918, respectively.[1] His approved sentence is a dishonorable discharge, confinement for life, total forfeitures, and reduction to E–1. We granted review of this issue:

> WHETHER THE MILITARY JUDGE ERRED BY ADMITTING APPELLANT'S STATEMENTS, MADE WITHOUT COUNSEL PRESENT, TO A CIVILIAN DETECTIVE AND A NAVAL INVESTIGATIVE SERVICE AGENT WHO KNEW APPELLANT HAD BEEN DETAILED A MILITARY COUNSEL WITH WHOM HE ALREADY CONFERRED.

## I

The deceased, Aviation Electrician's Mate Second Class Gregory V. Swafford, was one of appellant's roommates at the Naval Air Station, Norfolk, Virginia. According to appellant's multiple admissions, he and his friend, Operations Specialist Seaman Thomas E. Hardnett, Jr., prevailed upon Swafford to drive them into Norfolk on the evening of February 2, 1985. Before leaving the air station, Hardnett informed appellant of his intent to rob Swafford.

When Swafford dropped the pair off in Norfolk, Hardnett provoked an argument. Appellant restrained Swafford while Hardnett killed him; appellant removed his wallet. Together they loaded the deceased into the trunk of his car, drove to a nearby body of water (a tidal creek branching off the Elizabeth River) in Chesapeake, Virginia, and dumped the corpse in the creek. Ultimately, they returned to the air station, leaving the car in a parking lot there. When Swafford turned up missing the next

---

1. He was also convicted of unpremeditated murder, but the Court of Military Review dismissed that specification and otherwise affirmed the findings and sentence in an unpublished opinion dated June 30, 1987.

day, their story was that they last saw him when he dropped them off in town the evening before. Due to the coldness of the water at that time of year, the body did not surface for several months.

The unfolding of the story of appellant's involvement spanned many months. Because Swafford was a "4.0 sailor" and because his car was located on base, the naval authorities did not believe he was an unauthorized absentee. Rather, "a worst-case scenario" was assumed from the outset. Along with dozens of other sailors, appellant was interviewed in an effort to find out anything possible about Swafford's disappearance. On February 8, 1985, appellant provided his initial statement to a Naval Investigative Service (NIS) special agent. Appellant clearly was not a suspect at this time; he was not advised of his rights; and he related the cover story agreed upon with Hardnett.

The intensity of the investigation increased dramatically after April 3, 1985, when Swafford's body was discovered having surfaced within the jurisdiction of Chesapeake, Virginia. A camera strap, later identified as Hardnett's, was still tightly tied around Swafford's neck. The pathologist who examined the body opined that the cause of death was strangulation. Up until the finding of the body, foul play had not been conclusively established. The discovery touched off another round of interviews, involving this time both naval investigators and those of the City of Chesapeake.

Because appellant and Hardnett had provided the last confirmed sighting of Swafford, they were reinterviewed with great particularity.[2] By this time, appellant and others of his unit were deployed in the Mediterranean; Hardnett remained in Norfolk and was interviewed before appellant.

Appellant was interviewed onboard the USS PUGET SOUND (AD-38) at Gaeta, Italy, on May 3, 1985. Two law-enforcement officers traveled from Virginia to Italy as part of the continuing investigation: Special Agent Brian A. Cashman, NIS, and Detective Colin S. Griggs, Chesapeake Police Department. Their trips were financed by their respective agencies. Due to the location of the deceased's body and the lack of an established military connection, it was assumed that Chesapeake had jurisdiction in the case. In addition to appellant, 26 or 27 other servicemembers were interviewed in and about Gaeta. Appellant's interview, however, was one of only three in Italy that was tape-recorded and transcribed.

The law-enforcement officers still did not regard appellant as a suspect, and they did not advise him of his rights. Nevertheless, since he was one of the last people to see the deceased alive, they pressed him hard for details. Under close questioning about collateral events on the night Swafford disappeared, appellant's account varied in several respects from the account most recently given by Hardnett.[3] The investigators told appellant flatly that his account "differ[ed] significantly" from Hardnett's in several respects. After one such discrepancy, Special Agent Cashman went so far as to inquire of appellant: "O.k., do you know what making a false official statement means?"

Despite the officers' stated belief that appellant was not yet a suspect, the military judge concluded that

one need only to read the transcript of the 3 May statement by the accused to know that if the NIS Agent did not sub-

---

2. The complete content of Hardnett's interviews are not of record, but parts of them were presumably revealed by investigators while questioning appellant and confronting him with inconsistencies between his and Hardnett's accounts.

3. Appellant maintained that the chronology detailed by Hardnett, concerning which particular bars they patronized after Swafford dropped them off and which particular women they encountered, had actually occurred on a different night from the night Swafford disappeared. According to appellant, he and Hardnett had visited that same vicinity on several occasions during the general time period. Appellant's recollection, therefore, as to their itinerary after they had last seen Swafford alive was somewhat different from Hardnett's.

jectively suspect the accused of being involved in Swafford's death, he should have been by any objective standard[.]

Therefore, the judge suppressed appellant's May 3 statement. However, he observed that appellant's statement was not apparently incriminating, but merely differed in collateral detail from Hardnett's. Indeed, appellant clung tenaciously to the basic story that he and Hardnett had concocted, i.e., the last time they saw Swafford was when he dropped them off in town. Therefore, since "the cat was not let out of the bag," the judge ruled that the officers' failure to advise appellant of his rights and to secure appropriate waivers on May 3 did not affect any of appellant's subsequent admissions. Moreover, the judge concluded that even if the May 3 statement contained incriminating admissions, the rights advisements given prior to the subsequent statements and the voluntary waivers of these rights by appellant were sufficient to purge any possible taint. See n.5, infra. Appellant was not arrested or in any way restricted following the May 3 interview.

In the opinion of the law-enforcement community, appellant and Hardnett became suspects as of June 12, 1985, when Hardnett, still in the States, failed three successive polygraph examinations.[4] From this point onward, all statements provided by appellant to law-enforcement agents, military or civilian, were preceded by appropriate rights warnings and waivers.[5]

After appellant was classified as a suspect by the law-enforcement community, the next official to contact him was NIS Special Agent Ronald J. Possanza, who was based in Sicily. Possanza caught up with appellant on July 22, 1985, aboard the USS KIDD (DDG–993), in the port of Haifa, Israel. Appellant consented to a search of his lockers.[6] There Possanza found two handwritten letters from Hardnett, sent to appellant through an intermediary.

In one of the seized letters, Hardnett advised appellant that he (Hardnett) had "fucked up" in his last conversation with the investigators by embellishing some of the collateral details about the evening in question. This letter appears to explain the inconsistencies between appellant's May 3 statement and Hardnett's last statement. It went on to instruct appellant how to tailor his story to dovetail with Hardnett's. It also cautioned appellant "to swear that you didn't talk to me or get a letter from me telling you anything that went on with Greg [Swafford] since you've been on this cruise!" And it ended with this fateful admonition, "[B]urn this letter as soon as you read it." Unfortunately for appellant, he failed to heed this last piece of advice.

The seizure of this letter apparently broke the case wide open. Armed with this glaring item of refutation, Possanza confronted appellant the next day, July 23, after first advising him of his rights and securing waivers thereof. Only the day before, appellant had still denied all knowledge of Swafford's disappearance. On the 23d, however, he began to back-pedal.

He now claimed that, several hours after Swafford dropped Hardnett and him off in town, Swafford reappeared and agreed to drive them back to base. On the way back, according to this account, Swafford made homosexual advances toward Hardnett and a "fuss" ensued. Swafford pulled the car off the road near a river, and they all got out. A fight developed between Hardnett and Swafford, which resulted in Swafford's death. Though appellant was "very drunk," he tried unsuccessfully to break up the fight, according to this version. Hardnett alone dragged the body into the water.

---

4. This information was revealed during an Article 39(a), Uniform Code of Military Justice, 10 USC § 839(a), session in conjunction with several pretrial motions made by appellant. It was not received in evidence on the merits or otherwise communicated to the court members.

5. Though there is no issue before us concerning the correctness of the military judge's conclusions, they are well-founded in both fact and law. See Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

6. The validity of this consent is not before us.

Appellant never touched Swafford, did not take his wallet, and did not see Hardnett take it.

After the July 23 statement, arrangements were immediately made to transport appellant back to the States. He arrived in Norfolk late in the evening of July 26, 1985, accompanied by Special Agent Possanza. He was met in Norfolk by Special Agent Cashman and Detective Griggs, among others. He was again advised of his rights, which he waived. Agreeing to show the officers where the events had transpired, appellant rode in Detective Griggs' vehicle and directed the officers through his route on the night of February 2–3. Ultimately, he led them to a spot next to the same tidal creek where the body was recovered. He identified the location as the site where Hardnett killed Swafford. That night appellant was billeted in officers' quarters.

The next day, July 27, the group returned to the site, and appellant confirmed his identification in the daylight. That afternoon, at the NIS office, appellant made another sworn statement after again being advised of and waiving his rights. He once more recounted Hartnett's killing of Swafford and his own futile attempt to break up the fight. This time, however, he admitted having put his hand on Swafford's chest after the fight, detecting no heart beat, and pronouncing him dead. Then, under compulsion from Hardnett, he helped drag the body into the water.

On July 28, appellant revised his story once again in a sworn statement transcribed by NIS agents. This time he indicated that, as he was trying to break up the fight, Hardnett "jumped" him from behind and drove him onto Swafford in such a way that appellant's

> forearm landed across Greg's throat and neck area, specifically across Greg's Adams apple, because I could feel his Adams apple on my forearm. There was a lot of pressure on Greg's throat and Adams apple from Thomas [Hardnett] being on top of me, because the next day, my right forearm was sore and [there was] a little swelling on the forearm where it laid across Greg's Adams apple. Thomas was pushing on top of me so hard that my face and mouth were pushed into Greg's right bicep. Thomas was on top of me and my forearm was across Greg's throat for about 15 or 30 seconds. Thomas at this time was yelling, "Kill the son of a bitch!"

After appellant managed to extricate himself from the fracas, according to the statement, Hardnett proceeded "to strangle" Swafford "with his bare hands." Appellant temporarily succeeded in pushing Hardnett off Swafford, but Hardnett returned with his camera strap and tied it tightly around Swafford's neck. In the statement, appellant reiterated that the fight was between Hardnett and Swafford over the alleged homosexual overtures and that appellant's involvement was entirely inadvertent and innocent. Though appellant "felt . . . [his] arm on Greg's neck may have been the crucial or critical injury causing Greg's death," it was only so because he "was unable to get . . . [his] arm free from Greg's neck." Appellant also explained in the statement that he had previously withheld this information due to its obvious potential for misinterpretation with respect to his culpability.

On July 28, appellant was ordered into pretrial confinement by military authorities. In the afternoon of July 30, Lieutenant Stephen A. Stallings, JAGC, USN, received notification that he had been appointed appellant's defense counsel. He met with appellant in the brig the next morning, July 31, for approximately 2 hours. He had already been informed that the civilian authorities might be taking jurisdiction in the case.

While Lieutenant Stallings was talking with appellant, Detective Griggs arrived at the brig with a Chesapeake warrant for appellant's arrest. After Stallings departed—he was unaware of Griggs' presence at the brig—the military authorities released appellant into Griggs' custody. Griggs knew appellant had a military attorney, but believed "that his military attorney had no

authority off the military base once ... [Griggs] served those papers on" appellant. Military charges were not, at that time, preferred against appellant.

The same day, July 31, Griggs took appellant to Chesapeake police headquarters, where he advised him of his rights to remain silent and to counsel under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and the Fifth Amendment to the United States Constitution. Appellant waived his rights and agreed to talk to Griggs without counsel present. Neither Griggs nor appellant mentioned Lieutenant Stallings.

Thereafter, Griggs interrogated appellant in a tape-recorded interview; the content of the interview was transcribed, and appellant swore under oath that it was a true statement. In this statement, appellant made the following admissions: The incident occurred at the time appellant and Hardnett were *first* dropped off *in Norfolk* (rather than much later *in Chesapeake* after a bout of drinking). The motive for the killing was plain robbery (the homosexual-advance claim was never hereafter repeated). Hardnett began to hassle Swafford in the car about money, and the argument ensued. When appellant and Hardnett got out of the car, Hardnett called Swafford out to discuss "financial problem[s]." The fight developed when Swafford declined to donate. As Hardnett was attempting to apply the fatal tourniquet to Swafford's neck, he instructed appellant to "grab his hands, grab his hands, ... because Gregg was fighting back and hard and stuff." Appellant dutifully complied, while Hardnett

> pulled hard or yanked as far as you can feel something popping there, and Gregg just went down like, like a, like his life just went out his body and he was holding Gregg up like this by this thing.

Again upon command, according to the statement, appellant removed Swafford's wallet and gave it to Hardnett. Appellant then assisted in putting the body in the trunk and rode along, with Hardnett driving, to the Chesapeake site near the water. There, appellant helped carry the body into the water. Then the two returned to the bars of Norfolk, where they encountered a prostitute, whose services they shared. According to appellant, he refused to accept any of Swafford's money and paid his share with his own money. Afterward, they returned to the air station in Swafford's car.

After making the July 31 statement, appellant led the officers to the alleyway in Norfolk where the killing had taken place. Presumably, appellant was arraigned the next day, August 1, in Chesapeake.[7]

Appellant's mention that the killing took place in Norfolk changed the complexion of the case. The Virginia prosecutorial authorities agreed that, under Virginia law, the situs of a murder takes precedence over the place where the body is found, for purposes of jurisdiction. Therefore, on August 2, after being apprised of the facts then known, officials from the City of Norfolk decided that Norfolk was the appropriate entity to take jurisdiction in the case.

On August 3, law-enforcement officers from Norfolk assumed custody of appellant and immediately set about to question him. After again being advised of his rights and waiving them, appellant described the events substantially as before. For the first time, however, he admitted that, at the barracks before Swafford drove them into town, Hardnett had revealed his intent to "shake" Swafford, which appellant understood as meaning "to rob him." After making this additional concession, appellant led the Norfolk officers to the scene of

---

**7.** The only indication that appellant may have been arraigned in Chesapeake was Detective Griggs' surmise to that effect. Though Griggs was not present at any arraignment of appellant and did not know whether one had actually occurred, he assumed that, in the ordinary course of events, appellant would have been arraigned before a City of Chesapeake General District Court Judge on or about August 1 and asked whether he needed a court-appointed attorney. To the best of Griggs' knowledge, no attorney was appointed for appellant by the Chesapeake court.

the crime and reenacted what had taken place.

Upon returning to the police station, still on August 3, appellant repeated his last statement. This time the statement was tape-recorded and transcribed. While it was being typed up, appellant made the comment to the officers that he "wonder[ed] if the lawyer is going to handle my case." Asked which lawyer, appellant identified a civilian lawyer, Peter Decker, whereupon the officers promptly assisted appellant in looking up and dialing Decker's telephone number. However, appellant "got a recording." Asked what he wanted to do then, appellant replied, "I guess I'll have to wait until Monday and try him at the office." Appellant never requested to have a lawyer present at the interview and never mentioned Lieutenant Stallings' name. When the transcription was completed, appellant signed it.

With respect to this series of admissions, the military judge ruled:

> With regard to the 3 August statement to the Norfolk Police:
>
> The accused was properly advised of his Fifth Amendment and *Miranda* rights;
>
> He waived those rights and made a statement, Appellate Exhibit 15;
>
> His statement, "I wonder if an attorney is going to handle my case," was merely an expression of interest in future proceedings, and not a request for an attorney within the scope of *Miranda;*
>
> Assuming, however, it did constitute a request for counsel, it would not affect the statement he had already provided, but would impact only on the signature which he affixed to that statement.
>
> In conclusion, ... [t]he motion to suppress the statement[ ] of ... 3 August is denied.

Rather than redacting the signatures from the transcribed document and introducing the document itself into evidence on the merits, however, trial counsel elected to have the Norfolk police officer who had obtained the statement, Sergeant Hazelette, testify as to appellant's oral admissions prior to his inquiry about the attorney. Appellant was arraigned before a Norfolk General District Court Judge on August 7, 1985, and a civilian lawyer, Mr. Carlson, was appointed to represent him on August 9.[8]

Appellant's mention that the conversation regarding the robbery had occurred on the air station and had preceded the trip to town again changed the complexion of the case. Until that point, naval authorities were unsure whether the events had enough of a military connection to sustain military jurisdiction over the offenses. The new evidence of the on-station conversation convinced the naval authorities that their jurisdiction would be sustained. Therefore, on August 9, 1985, they formally requested the City of Norfolk to release appellant to their custody for purposes of court-martial.

Although there was no doubt that the Commonwealth of Virginia had jurisdiction to try appellant, the Commonwealth's Attorney for Norfolk agreed that the Navy had the "greater prosecutorial interest ... and more of a factual connection with the case than" did the Commonwealth, especially given that appellant, the victim, and the majority of the witnesses were military. Therefore, the Commonwealth moved, on August 12, 1985, "to nol pros the charges against" appellant in the Norfolk General District Court; the motion was granted.

Appellant was restored to military custody the same day, August 12, and was seen again by his military attorney on that day or the next. At the court-martial, Lieutenant Stallings served as detailed defense counsel, Lieutenant Timothy P. Sceviour served as assistant defense counsel, and a civilian attorney, Mr. Michael F. Fasanaro, Jr., served as lead defense counsel.

## II

Appellant's contention, in essence, is that he was unfairly prejudiced by the errone-

---

8. The Norfolk arraignment and the appointment of Mr. Carlson are of no consequence to this appeal, since the last of appellant's statements received in evidence was that of August 3.

ous receipt in evidence of his admissions on July 31 to Detective Griggs and on August 3 to Sgt. Hazelette. The basis for this claim is the formation of the attorney-client relationship between Lieutenant Stallings and appellant, which preceded these two statements. In appellant's view, these statements constituted violations of his Sixth Amendment right to counsel and the notice requirements of Mil.R.Evid. 305(e), Manual for Courts–Martial, United States, 1984.[9]

Before addressing these issues, it is necessary to review the status of subject-matter jurisdiction as it appeared to be in July–August, 1985. In *O'Callahan v. Parker*, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969), the Supreme Court, departing from long-established precedent, announced that only "service-connected" offenses could thereafter be tried by courts-martial.[10] This opinion was followed by *Relford v. Commandant*, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971), which enumerated multiple factors having to be balanced on a case-by-case basis to determine whether an offense was service-connected. These opinions and those of the military appellate courts applying them cast into considerable doubt the jurisdictional status of many offenses committed off military installations. *E.g., United States v. Klink*, 5 M.J. 404 (C.M.A.1978) (drug transaction between servicemembers occurring 30–feet off-post lacked service-connection); *United States v. Sims*, 2 M.J. 109 (C.M.A.1977) (no service-connection in off-post forgery of mon-

ey orders, where accused purchased money orders from fellow soldier, knowing they were stolen on-base from another soldier, and where accused forged the money orders and cashed them off-post, using his military identification card).

Admittedly, many of these earlier military opinions were substantially eroded by subsequent opinions. *E.g., United States v. Lockwood*, 15 M.J. 1 (C.M.A.1983); *United States v. Trottier*, 9 M.J. 337 (C.M.A. 1980). Nonetheless, genuine doubt as to jurisdiction could still exist in a given set of facts. *United States v. Abell*, 23 M.J. 99, 103 (C.M.A.) ("accused's status as a servicemember is not sufficient in and of itself to confer jurisdiction over all his offenses no matter where and when committed"), *cert. denied*, 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987). One factor which often persuaded courts that service-connection existed was commencement of the offense on-post, even though it was consummated off-post. *E.g., United States v. Strangstalien*, 7 M.J. 225 (C.M.A.1979) (on-post agreement to transfer drugs off-post).

On June 25, 1987, the Supreme Court published its decision in *Solorio v. United States*, 483 U.S. 435, 107 S.Ct. 2924, 97 L.Ed.2d 364. That opinion overruled *O'Callahan* and its progeny, and it abolished the jurisdictional doctrine of service-connection.[11] Instead, the Supreme Court held that court-martial subject-matter jurisdiction depended solely on whether the accused "was a member of the armed servic-

---

9. Mil.R.Evid. 305(c), Manual for Courts–Martial, United States, 1984, provides:

A person subject to the code who is required to give warnings under Article 31 may not interrogate or request any statement from an accused or a person suspected of an offense without first:

(1) informing the accused or suspect of the nature of the accusation;

(2) advising the accused or suspect that the accused or suspect has the right to remain silent; and

(3) advising the accused or suspect that any statement made may be used as evidence against the accused or suspect in a trial by court-martial.

The August 3 statement is claimed to be "fruit of the poisonous tree," *i.e.*, the tainted July 31

statement. As a variation on this theme, appellant also contends that use of these statements was "fundamentally unfair" and that we should exercise our "supervisory powers" to find error in their receipt in evidence. Because we find these statements to have been properly admitted, we decline to exercise "supervisory powers" to exclude them.

10. *See* Droddy, *King Richard to Solorio: The Historical and Constitutional Bases for Court–Martial Jurisdiction in Criminal Cases*, 30 A.F.L. Rev. 91 (1989).

11. Though court-martial jurisdiction over the offense is not an issue on this appeal, there appears to be no doubt of such jurisdiction under either *O'Callahan/Relford* or *Solorio*.

es at the time of the offense charged." 483 U.S. at 451, 107 S.Ct. at 2933 (footnote omitted). After *Solorio* was announced, we applied it to cases arising prior to that decision, either on the grounds of retroactivity, *see Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), or because *Solorio* was simply a correct interpretation of always-existing jurisdiction. *United States v. Avila*, 27 M.J. 62, 65–66 (C.M.A.1988).

Appellant's case evolved during the pre-*Solorio* era. This accounts for what might otherwise appear to be a game of legal hot potato being played by the military and civilian authorities.[12]

Turning to appellant's counsel rights, Article 27(a)(1), UCMJ, 10 USC § 827(a)(1), establishes the requirement that "[t]rial counsel and defense counsel shall be detailed for each general and special court-martial." Mil.R.Evid. 305(e) adds:

> When *a person subject to the code* who is required to give warnings under subdivision (c)[13] intends to question an accused or person suspected of an offense and knows or ·reasonably should know that counsel either has been appointed for .or retained by the accused or suspect with respect to that offense, the counsel must be notified of the intended interrogation and given a reasonable time in which to attend before the interrogation may proceed.

(Emphasis added.) A "person subject to the code" is further defined as "includ[ing] a person acting as a knowing agent of a military unit or of a person subject to the code." Mil.R.Evid. 305(b)(1).

The logic of appellant's argument proceeds as follows: The military and civilian investigations had become so enmeshed that each side was "acting as a knowing agent of" the other. Mil.R.Evid. 305(b)(1).

Hence, the civilian police officers were "person[s] subject to the code." Mil.R. Evid. 305(e). As Lieutenant Stallings had already been "appointed for ... the accused ... with respect to that offense," he should have been "notified of the intended [civilian] interrogation and given a reasonable time in which to attend." *Id.*

■■■ This analysis breaks down for two reasons. First, it is quite obvious that, in enacting Article 27, Congress was interested in providing servicemembers with competent and free legal representation in courts-martial. There is not the slightest trace of a suggestion in the extensive legislative history of this article that Congress intended thereby to inject military counsel into state criminal matters. Attachment of a right to military counsel for military proceedings neither enlarges nor decreases a servicemember's right to counsel in civilian proceedings. Unless military counsel are authorized to practice in state courts by state authorities and are given leave from their military duties, they simply have no role in state criminal matters. Neither of these conditions applied here; once the civilians asserted jurisdiction, military counsel's role ended.

■■■ Second, the civilian police were not acting as agents of military authorities. Clearly, they were not directly subject to the Uniform Code of Military Justice, and appellant does not so contend. With respect to his argument that, by virtue of the close working relationship between the various law-enforcement agencies, the civilian and military investigations had become so enmeshed that they "merged into an indivisible entity," both the military judge and the Court of Military Review found the contrary to be true as a matter of fact. These courts concluded that the investigators, while closely coordinating their activi-

---

**12.** Any implication that the military authorities were merely playing games with appellant to circumvent his military right to counsel must be dealt with succinctly. Much of the background information available in the record of trial is attributable to appellant's own motion to dismiss the military charges on the ground that the offenses lacked service-connection and that the

civilian interest was paramount. Indeed, the Commonwealth Attorney for the City of Norfolk (a distinguished judge advocate now retired) was called as a witness by the defense in an apparent attempt to establish this very point.

**13.** *See* n.9, *supra.*

ties and often working together, were at all times exclusively representing their respective sovereigns, and neither side became the agent of the other.

I also have reviewed this record carefully, and I fully agree with these conclusions. *Cf. United States v. Morrison,* 12 M.J. 272 (C.M.A.1982); *United States v. Ravine,* 11 M.J. 325 (C.M.A.1981). Accordingly, in my view, neither Article 27(a)(1) nor Mil.R. Evid. 305(e) obligated the civilian investigators to notify appellant's military counsel, and neither provision acts as a bar to receipt in evidence of appellant's statements to the civilians.

Next, I consider appellant's contention that his Sixth Amendment right to counsel was violated by the custodial interrogations conducted by Chesapeake and Norfolk authorities on July 31 and August 3, 1985. The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." The Supreme Court has interpreted this to mean "that the right to counsel does not attach until the initiation of adversary judicial proceedings." *United States v. Gouveia,* 467 U.S. 180, 188, 104 S.Ct. 2292, 2297, 81 L.Ed.2d 146 (1984); *see also Brewer v. Williams,* 430 U.S. 387, 398–99, 97 S.Ct. 1232, 1239–40, 51 L.Ed.2d 424 (1977); *Kirby v. Illinois,* 406 U.S. 682, 688–89, 92 S.Ct. 1877, 1881–82, 32 L.Ed.2d 411 (1972) (plurality opinion).

Adversary judicial proceedings commence for an accused

> at or after the time that judicial proceedings have been initiated against him— "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."

*Brewer v. Williams, supra* 430 U.S. at 398, 97 S.Ct. at 1239, quoting *Kirby v. Illinois, supra,* 406 U.S. at 689, 92 S.Ct. at 1882. Attachment of the Sixth Amendment right

> guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a "medium" between him and the State.

*Maine v. Moulton,* 474 U.S. 159, 176, 106 S.Ct. 477, 487, 88 L.Ed.2d 481 (1985). *See also Brewer v. Williams, supra,* 430 U.S. at 399, 97 S.Ct. at 1240; *Massiah v. United States,* 377 U.S. 201, 205–07, 84 S.Ct. 1199, 1202–04, 12 L.Ed.2d 246 (1964).

■ Appellant's contention is that adversary judicial proceedings had already commenced in the military, prior to July 31, 1985, when the civilian authorities assumed control of him; and hence his Sixth Amendment rights had attached. The result, in appellant's view, is that the civilian authorities were obligated to deal with him through the "medium" of counsel. As Lieutenant Stallings was the only counsel appellant arguably had at the time, any admissions made by him in the absence of Lieutenant Stallings were barred by the Sixth Amendment.[14]

■ In my view, this analysis fails for several reasons. First, as already indicated, appellant's relationship with Lieutenant Stallings was limited to military proceedings. *Vis-a-vis* the civilian charges, Lieutenant Stallings had no official role. Second, the mere formation of an attorney-client relationship does not trigger a Sixth Amendment right to the presence of counsel. *Moran v. Burbine,* 475 U.S. 412, 428–32, 106 S.Ct. 1135, 1145–47, 89 L.Ed.2d 410 (1986). Third, pretrial confinement[15] does

**14.** Appellant does not contend, and he did not do so at trial, that his statement on August 3 to Sgt. Hazelette of the Norfolk police was barred by virtue of an arraignment on or about August 2 in Chesapeake. *See Michigan v. Jackson,* 475 U.S. 625, 629, 106 S.Ct. 1404, 1407, 89 L.Ed.2d 631 (1986), citing *United States v. Gouveia,* 467 U.S. 180, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984); *see also Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977); *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972) (plurality opinion).

His failure to object at trial, in any event, constitutes waiver of such a claim. Mil.R.Evid. 103(a). Indeed, it is not even clear (*see* n.6, *supra*) that such an arraignment occurred, much less that appointment of counsel was requested.

**15.** It is unclear whether appellant's brief military confinement from July 28–31, pending release to civil authorities, was properly classified as "pretrial restraint," under the provisions of

not initiate adversary judicial proceedings or otherwise trigger the Sixth Amendment right to counsel. *United States v. Gouveia, supra,* 467 U.S. at 189–91, 104 S.Ct. at 2298–99.

We have previously held that, in the military, preferral of charges initiates adversary judicial proceedings and causes the Sixth Amendment right to counsel to attach. *United States v. Wattenbarger,* 21 M.J. 41 (C.M.A.1985), *cert. denied,* 477 U.S. 904, 106 S.Ct. 3272, 91 L.Ed.2d 563 (1986). However, charges were not preferred in this case until August 21, 1985, some 9 days after appellant was returned to military control by Norfolk authorities and long after the events in question.

In the military, however, an accused placed in pretrial confinement has the right to "[a] review of the adequacy of probable cause to believe the prisoner has committed an offense and of the necessity for continued pretrial confinement ... within 7 days of the imposition of confinement." RCM 305(i)(1), Manual, *supra.* If the prisoner requests it, "military counsel shall be provided to the prisoner before the initial review under subsection [305](i)." Such counsel is "assigned for the limited purpose of representing the accused only during the pretrial confinement proceedings before charges are referred." RCM 305(f).

 We have never held that a review of the propriety of pretrial confinement constitutes commencement of adversary judicial proceedings for Sixth Amendment purposes. It is unlikely that we will ever confront such a question since counsel is automatically provided an accused upon request. However, even if—for the sake of argument—such a proceeding did trigger a

Sixth Amendment right to counsel, it would be of no moment to this case since no such proceeding or hearing occurred in this case prior to appellant's release to Chesapeake authorities. Thus, notwithstanding appellant's condition as a pretrial restrainee or confinee, and notwithstanding the appointment of military counsel, adversary judicial proceedings had not commenced in the military against appellant prior to his release to civilian authorities. Therefore, in my view, the civilian law enforcement officers had no Sixth Amendment duty to notify counsel and did not violate appellant's rights under that provision by questioning him in the absence of counsel.

Lastly, I consider the contention, first raised by the dissenting opinion herein and not advanced by appellant, that all admissions made by appellant after Lieutenant Stallings contacted him in the brig were barred by the Fifth Amendment.[16]

It is now well-settled that, under the Fifth Amendment, "an accused ... *having expressed his desire to deal with the police only through counsel,* is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981) (emphasis added); *see also Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983); *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

As the Supreme Court later explained:

The rule of the *Edwards* case came as a corollary to *Miranda*'s admonition that "*[i]f the individual states that he wants an attorney, the interrogation*

---

RCM 304(a), Manual, *supra,* or "pretrial confinement," under RCM 305. However, for purposes of this appeal, it makes no difference what his status was.

**16.** The Fifth Amendment to the Constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself...." Of course the Fifth Amendment contains no express right to counsel or to consult with counsel. That require-

ment was established in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), "to insure that the right against compulsory self-incrimination was protected." *Michigan v. Tucker,* 417 U.S. 433, 444, 94 S.Ct. 2357, 2364, 41 L.Ed.2d 182 (1974). Appellant does not claim ever to have asserted a right to counsel under the Fifth Amendment or *United States v. Tempia,* 16 USCMA 629, 37 CMR 249 (1967), while being questioned.

*must cease* until an attorney is present." 384 U.S., at 474, 86 S.Ct. at 1627–1628. *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 2097, 100 L.Ed.2d 704 (1988)(emphasis added). *See also Fare v. Michael C.,* 442 U.S. 707, 718, 99 S.Ct. 2560, 2568, 61 L.Ed.2d 197 (1979) ("interrogation must cease upon the accused's request for an attorney").

*Roberson* extends or clarifies *Edwards* in two respects: First, the opinion makes clear that police may not reinitiate contact with a "suspect, having requested counsel," even concerning an unrelated offense.[17] 108 S.Ct. at 2101. As appellant was never contacted by any investigators about any offense other than Swafford's murder, this aspect of *Roberson* adds nothing to *Edwards* with respect to this case. Second, it is clear after *Roberson* that it does not matter "that the officer who conducted the second interrogation did not know that ... [the accused] had made a request for counsel." Rather, law enforcement officials must establish procedures which will "enable an officer who proposes to initiate an interrogation to determine whether the suspect has previously requested counsel." *Id.* 108 S.Ct. at 2101. This was the law in the military prior to *Roberson. United States v. Goodson,* 22 M.J. 22 (C.M.A.1986). In any event, there is no issue in this case about the failure of an investigator to determine whether appellant had requested counsel. Thus, *Roberson* adds nothing to *Edwards* as applied to the facts of this case.

Chief Judge Everett makes an eloquent argument, equating "a request for counsel" under RCM 305(f) with an exercise of rights under *Edwards v. Arizona, supra,* 29 M.J. at 191—with the result that civilian investigators would be barred from questioning appellant unless he initiated the conversation. The problem is the Chief Judge is the only one who has ever made this assertion. Appellant never claimed to have invoked a right to counsel: Trial defense counsel did not claim he did; and even appellate defense counsel have not so contended. Until now, no one has suggested that appellant ever sought to convey to anyone a desire to communicate with the police only through the medium of counsel. This case was litigated on a constitutional level as a Sixth Amendment matter all along, not as a Fifth Amendment one. Never was it alleged that the authorities failed to scrupulously honor appellant's wishes with respect to counsel.

▮ As I read the Supreme Court's decisions, the Fifth Amendment exclusionary rule is triggered when an accused who has been advised of his rights *communicates* to law-enforcement personnel that he is unwilling to talk to them except through the medium of counsel. Ordinarily—but not necessarily—this occurs during an attempted interrogation. *See United States v. Goodson, supra.* The mere fact, however, that appointed military counsel went to the brig and discussed some aspects of the case with appellant is not, in my opinion, an invocation of the Fifth Amendment right to counsel. *Cf. Moran v. Burbine, supra.* My view does not turn on whether the accused asked to see a lawyer or the lawyer was merely assigned as a matter of course.

There may be many reasons why an accused wishes to consult with counsel, either about the case itself or about collateral matters, without necessarily manifesting a desire not to discuss the case with law-enforcement officials.[18] Again, there is sim-

---

**17.** Law-enforcement officials are permitted, however, "to inform the suspect of the facts of the second investigation as long as such communication does not constitute interrogation...." 108 S.Ct. at 2101.

**18.** In our opinion today we do not imply any retreat from the ruling in *United States v. McOmber,* 1 MJ 380, 383 (CMA 1976). That opinion, based on Article 27, Uniform Code of Military Justice, 10 USC § 827, held that "once an investigator is on notice that an attorney has undertaken to represent an individual in a military criminal investigation, further questioning of the accused without affording counsel reasonable opportunity to be present renders any statement obtained involuntary under Article 31(d) of the Uniform Code." Neither by their terms nor their legislative histories do Articles 27 or 31 apply to civilian investigations.

ply no indication in this record that appellant, despite his obvious awareness of his rights, ever declined to discuss the case without counsel. Indeed, as far as this record discloses, the only reference appellant ever made about counsel was his off-hand remark, after his final interview in Norfolk, concerning whether Mr. Decker would "handle" the case. Had appellant timely communicated to any official, military or civilian, his preference not to talk in the absence of counsel, military or civilian, I would have no hesitancy in concluding that he had exercised his Fifth Amendment right to counsel—with the consequential exclusion of later statements obtained as a result of police-initiated interrogation. That is to say—had appellant expressed even to *civilian* officials his desire to consult with *military* counsel prior to answering questions, I would find a Fifth Amendment invocation. However, these were not the circumstances of this case.

I obviously agree with Judge Sullivan, concurring in the result, that statements taken on July 31 and August 3, 1985, were voluntary and preceded by appropriate waivers of counsel. Therefore, a majority of the Court holds that the statements made by appellant on July 31 and August 3, 1985, were admissible in evidence.

The decision of the United States Navy–Marine Corps Court of Military Review is affirmed.

SULLIVAN, Judge (concurring in the result):

I agree with my Brother Cox's result because the circumstances of this case clearly show that the statements of appellant on July 31 and August 3 were voluntary and were preceded by appropriate waivers of counsel.

EVERETT, Chief Judge (dissenting):

At trial appellant moved to suppress the incriminating statements he had given to civilian detectives on July 31 and August 3.

He contended that his right to counsel had been violated. The military judge denied the motion, but I conclude that he erred in doing so.

To place the issue in perspective, it should be recognized that the statement made on July 31 to Detective Griggs of the Chesapeake Police Department was the product of a lengthy joint investigation in which Griggs had been engaged with Special Agent Cashman of the Naval Investigative Service (NIS). In fact, the two investigators had travelled together to Italy in May 1985 and had jointly interrogated appellant and many others.

In late July, appellant had given an incriminating statement to another NIS agent and had been returned to Norfolk, where on July 28 the Navy had placed him in pretrial confinement. I agree with the lead opinion that this confinement did not initiate formal adversarial proceedings that would trigger Jordan's Sixth Amendment right to counsel, and it did not bring Article 27 of the Uniform Code of Military Justice, 10 USC § 827, into play. However, under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the confinement created for appellant a Fifth Amendment right to counsel with respect to any interrogation that followed while he remained in custody.[1]

On the morning of July 31, Jordan conferred for about 2 hours with Lieutenant Stallings, a military lawyer who had been assigned to represent him. The lead opinion observes that, pursuant to RCM 305(f), Manual for Courts–Martial, United States, 1984, Lieutenant Stallings was "assigned for the limited purpose of representing the accused only during the pretrial confinement proceedings before charges are referred." 29 M.J. at 184. However, this observation does not conform fully with the rule which, in its entirety, states:

> *If requested by the prisoner*, military counsel shall be provided to the prisoner before the initial review under subsection (i) of this rule. Counsel *may* be assigned

---

1. On July 31 military authorities released Jordan to the custody of Detective Griggs; the impor-

tant thing is that, thereafter, he was still in police custody while being interrogated.

for the limited purpose of representing the accused only during the pretrial confinement proceedings before charges are referred. *If assignment is made for this limited purpose, the prisoner shall be so informed.* Unless otherwise provided by regulations of the Secretary concerned, a prisoner does not have a right under this rule to have military counsel of the prisoner's own selection. (Emphasis added.)

Under this language, military counsel shall be provided "[i]f requested by the prisoner." Therefore, assuming regularity and compliance with regulations, I infer that Lieutenant Stallings was assigned as counsel for Jordan because he was "requested" by appellant, who was then a "prisoner." Secondly, even though counsel "may be assigned for the limited purpose of representing the accused only during the pretrial confinement proceedings," this language is permissive and indicates that counsel also may be assigned without any limitation as to his representation of the accused. Nothing in the present record of trial indicates that Lieutenant Stallings was assigned "only" to represent Jordan during the pretrial confinement proceedings.

Indeed, all the facts point in the opposite direction. There is no testimony that Jordan was informed that Lieutenant Stallings was assigned only for a limited purpose; and on the morning of July 31, Jordan and Lieutenant Stallings conferred for 2 hours—which would be an unusually long period of time if the assignment of counsel had been "for the limited purpose of representing the accused only during the pretrial confinement proceedings before charges are referred."

According to the undisputed testimony of Lieutenant Stallings, his supervisor—Commander West—had advised him that he was going to represent Jordan with respect to a murder charge; and, in turn, Lieutenant Stallings had communicated to Commander Grant, the staff judge advocate for the convening authority, that he "had been assigned as the detailed military counsel to represent Spencer Jordan." Commander Grant testified that Lieutenant Stallings had called at about 9:00 a.m. on July 31 and had informed Grant "that he represented Jordan and that he was going over to the brig to speak with Jordan."

This testimony makes clear and the judge found that—even though "Lieutenant Stallings was assigned because the accused was in a Navy brig"—the assignment was for the general representation of Jordan in connection with the murder charge.

The lead opinion states that Congress never intended by enacting Article 27 "to inject military counsel into state criminal matters." 29 M.J. at 185. This conclusion is probably correct; but it has little relevance here. In the first place, the right to counsel involved in this case derives from the Fifth Amendment—as interpreted by *Miranda v. Arizona, supra,* and applied to military law by *United States v. Tempia,* 16 USCMA 629, 37 CMR 249 (1967)—and not from Article 27 of the Code. Secondly, here the "state criminal matter" was the killing of one servicemember by another—misconduct which also was a serious military crime. Thirdly, because both Virginia statutes and the Uniform Code had been violated, state and military officials had been conducting a joint investigation from the outset. Finally, the challenged evidence ultimately was offered and received in a trial by court-martial—rather than in a state court trial.

The lead opinion also comments that, "[u]nless military counsel are authorized to practice in state courts by state authorities and are given leave from their military duties, they simply have no role in state criminal matters." 29 M.J. at 185. In the abstract, this observation may be correct; but again it does not pertain to the facts of this case. The misconduct which the state authorities were investigating was also a major crime under the Uniform Code of Military Justice; and instead of being "given leave," Lieutenant Stallings had been duly assigned by a military superior the duty of representing Jordan in connection

with the military investigation of that crime. Furthermore, in view of the joint investigation by civilian and military investigators and the concurrent jurisdiction of state and military authorities over the crime, Lieutenant Stallings could not perform effectively his military duty of representing appellant without taking into account the investigation by civil authorities and the possibility that Jordan might be prosecuted in a state court.

Under the *Miranda* rules, a suspect who is in custody and has requested counsel cannot be interrogated unless and until he has "initiated" a discussion. *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *see Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). It makes no difference that the request for counsel concerns one offense and the interrogation concerns another that is totally unrelated. *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). Therefore, even if we treat appellant's violation of Virginia law as completely separate from the military offense, *Roberson* teaches that a request for counsel in connection with the military offense would prevent civilian investigators from interrogating Jordan about the state crime, unless he "initiated" a discussion.

Under the language of RCM 305(f), it appears that Lieutenant Stallings was assigned to represent Jordan because appellant "requested" military counsel. Even if the request for counsel had been made only with respect to review of pretrial confinement, I believe that it would constitute a request for counsel within the meaning of *Edwards* and *Roberson.* By his request—whatever its form—Jordan made clear his state of mind that, in connection with the murder investigation and any related proceedings, he wished to have the assistance of a lawyer.

Under *Roberson,* it makes no difference that an interrogator is unaware of a suspect's earlier request for counsel. 108 S.Ct. at 2101. The focus is on the state of mind of the person questioned, rather than

on that of the interrogator. Therefore, inferring as I do that Jordan made a "request for counsel" within the purview of *Miranda,* Detective Griggs was precluded from questioning him about the murder, unless appellant "initiated" the discussion.

In fact, Detective Griggs had every reason to believe that Jordan had "requested" a lawyer. On July 31, when he went to pick up appellant at the Navy brig, Detective Griggs had to wait for Jordan to finish his 2–hour conference with his lawyer, Lieutenant Stallings.

The lead opinion interprets *Miranda, Edwards,* and *Roberson* in a very narrow way; and apparently it concludes that, because there was no evidence of a specific "request" by Jordan for an attorney in connection with the military investigation of the homicide, he could thereafter be interrogated at will by Detective Griggs without providing him counsel. Presumably, the same result would follow if the subsequent interrogation had been by a military investigator.

I disagree with this interpretation. In my opinion, the Navy's assignment of Lieutenant Stallings to Jordan and acceptance of his services by Jordan constituted the "functional equivalent" of the request for counsel required by *Edwards* and *Roberson. Roberson* decided that the focus of attention is on the state of mind of the accused; and establishment of the attorney-client relationship in connection with the pending criminal charges revealed the same state of mind on Jordan's part that would have been demonstrated by a "request" for counsel. Although I do not believe that the Supreme Court has directly decided this issue, I am convinced that investigators—whether military or civilian—are precluded by *Miranda* from undertaking pretrial custodial interrogation of a suspect who is represented by an attorney, unless either the attorney gives consent or the suspect "initiates" the discussion.

Accordingly, I come to the conclusion that Jordan's statement to Detective Griggs on July 31 was inadmissible in a criminal trial—whether by court-martial or

in a state court. This inadmissibility derives from the Fifth Amendment and its implementation by *Miranda*'s "prophylactic" rules. By the same token, Jordan's statement to Detective Hazlette on August 3 was inadmissible because, after being assigned Lieutenant Stallings as his counsel, Jordan never "initiated" a discussion of the homicide with anybody. The erroneous reception of these statements in evidence requires reversing the decision of the Court of Military Review. Therefore, I need not discuss other aspects of the lead opinion.[2]

**2.** Of course, I am at odds with the gratuitous conclusion in footnote 5 of the lead opinion that *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), applies. *See United States v. Ravenel*, 26 M.J. 344, 349 (C.M.A.1988) (Everett, C.J.).