# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————

**No. ACM 39478**

————————

**UNITED STATES**
*Appellee*

**v.**

**Christopher D. PLOURDE**
Master Sergeant (E-7), U.S. Air Force, *Appellant*

————————

Appeal from the United States Air Force Trial Judiciary

Decided 6 December 2019

————————

*Military Judge:* Donald R. Eller, Jr.

*Approved sentence:* Dishonorable discharge, confinement for 6 years, and reduction to E-1. Sentence adjudged 31 January 2018 by GCM convened at McConnell Air Force Base, Kansas.

*For Appellant:* Major Mark J. Schwartz, USAF; David P. Sheldon, Esquire; Tami L. Mitchell, Esquire.

*For Appellee:* Lieutenant Colonel G. Matt Osborn, USAF; Mary Ellen Payne, Esquire.

Before J. JOHNSON, POSCH, and KEY, *Appellate Military Judges.*

Judge KEY delivered the opinion of the court, in which Senior Judge J. JOHNSON and Judge POSCH joined.

————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————

KEY, Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of one specification of committing sexual assault on a junior Airman by causing bodily harm in violation of Article 120(b), Uniform

Code of Military Justice (UCMJ), 10 U.S.C. § 920(b).[1,2] The court-martial sentenced Appellant to a dishonorable discharge, confinement for six years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the adjudged sentence with the exception of the forfeitures.

On appeal, Appellant raises eight issues through counsel: (1) whether the court-martial lacked subject-matter jurisdiction over Appellant; (2) whether the evidence was factually and legally sufficient to support Appellant's conviction; (3) whether the military judge's instructions regarding consent and the defense of mistake of fact as to consent were erroneous; (4) whether the permissive inference of lack of consent in a sexual assault prosecution is constitutional; (5) whether trial counsel committed prosecutorial misconduct during closing argument; (6) whether Appellant's sentence was inappropriately severe; (7) whether a mandatory dishonorable discharge for a sexual assault conviction is unconstitutional; and (8) whether there were sufficient errors in Appellant's court-martial to cumulatively result in an unfair trial. Appellant personally raises three additional issues: (9) whether the military judge erred in denying the Defense's motion to admit evidence under Mil. R. Evid. 412; (10) whether the military judge erred in denying the Defense's motion to compel the appointment of an expert consultant in the field of forensic psychology; and (11) whether the military judge erred in denying the Defense's challenge for cause against one of the members.[3] We have carefully considered Appellant's ninth and tenth issues regarding Mil. R. Evid. 412 and the expert consultant and determine they are without merit and warrant no discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). Finding no error, we affirm the findings and sentence. Because we find no error, Appellant's eighth issue regarding the cumulative impact of alleged errors is moot.

---

[1] Unless otherwise indicated, all references in this opinion to the Uniform Code of Military Justice (UCMJ) are to the *Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*).

[2] Appellant was acquitted of two additional specifications of sexual assault against the same victim named in the specification he was convicted of, as will be discussed in this opinion.

[3] Appellant raises these three issues pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

## I. BACKGROUND

Then-Airman Basic (AB) KS reported to her first permanent duty station, McConnell Air Force Base (AFB), Kansas, in August 2016, where she met Appellant, a married master sergeant, on her first day. Appellant was in her supervisory chain and trained her on her duties.[4] The two interacted on a daily basis for about two months until Appellant deployed. At trial, Airman First Class (A1C) KS described how her relationship with Appellant was professional when she first arrived at McConnell AFB, but they became friends shortly thereafter, with A1C KS viewing Appellant as her "confidant sort of person," seeking his advice both on work-related issues as well as personal matters such as her relationship with her boyfriend, another Airman. A couple times a week, the two would hug towards the end of their conversations.

Upon return from his deployment, Appellant was assigned to a duty section in a different building. Thereafter, A1C KS spoke to Appellant less frequently, seeing him only two or three more times prior to 13 March 2017, the date of the offense. On that day, about seven months after she first arrived at McConnell AFB, 20-year-old A1C KS went to the base Finance office, which was in the same building as Appellant's office. While she was there, she decided to stop by Appellant's office "to say hello, just to check up on life, see how he was doing, how his family was doing." They talked about Appellant's family, his return from his deployment, how A1C KS had broken up with her boyfriend, and the stress she was under. Appellant said A1C KS's ex-boyfriend should "come back and take care of it," which A1C KS interpreted as a joking "sexual kind of comment." A1C KS perceived Appellant as being "sort of" flirtatious with her, and he made comments about A1C KS dancing for him. After about an hour, A1C KS said she had to get back to work, and the two hugged before she left his office. At trial, A1C KS characterized this hug as longer than typical—lasting "[m]aybe a minute"—and being "more of an embrace." She said her head was on his shoulder, and the hug was "more intimate" than the others.

Once back in her office, A1C KS logged on to her government computer and saw Skype messages from Appellant which read: "you should swing by more often . . . lol" and "don't ignore me . . . lol." A1C KS responded: "I was thinking the same thing lol" and "now who's ignoring who?" A few minutes later Appellant wrote: "are you going to swing by on the way home to get an-

---

[4] At some point during her assignment to McConnell AFB, AB KS promoted to the grade of airman. By the time of Appellant's trial, she had promoted to airman first class. We use the grade of airman first class for the remainder of the opinion.

other hug . . . lol." A1C KS responded: "I can!" Appellant then wrote: "your call." After exchanging a few more messages, A1C KS wrote: "yea I'll swing by after work," and Appellant said, "let me know when you get here . . . they may have locked the doors by the time you get off work." A1C KS said she would send a text message when she left her office, but Appellant told her, "message me on here" and "bring your music . . . lol," to which A1C KS wrote, "oh gees Sgt Plourde."

At about 1630 hours, the end of her duty day, A1C KS sent Appellant a message that she was leaving her work station, and she went to his office. When she arrived, A1C KS went into Appellant's office, pulling the door almost closed behind her. Appellant was working on his computer, so A1C KS started "playing on [her] phone" for about five minutes, waiting for Appellant to talk to her. Eventually, Appellant stood up and closed the blinds and the door to his office.

Concluding that Appellant was getting ready to leave and they were not actually going to finish their conversation from earlier in the day, A1C KS stood up to go out the door and go home. Appellant then hugged A1C KS with his hands being "kind of lower." She put her arms around his neck and her head on his shoulder. This hug lasted for about a minute and a half. Appellant moved his hands down A1C KS's body and grabbed and rubbed her buttocks for "a couple of minutes." Next, Appellant kissed A1C KS, and she kissed him back, testifying at trial that she was confused and describing her kiss as "kind of an immediate reaction."

Appellant lifted A1C KS onto his desk so that she was sitting with her feet hanging off the floor. Appellant started unbuttoning A1C KS's uniform blouse and said, "if you're uncomfortable, tell me to stop," to which A1C KS responded, "okay." At trial, she testified:

> I was like, okay, but I didn't say anything. . . . I wasn't sure what to say. I wanted him to stop; but, you don't really tell a master sergeant no and I was just calling him sir through the whole thing. So, it was just . . . I didn't know . . . it wasn't grasping in my mind what to do.

Appellant and A1C KS continued kissing for another minute or two. Appellant then took A1C KS's blouse off, put it on the floor, and undid her belt. A1C KS said "slow down, sir" in a "mumble," but Appellant did not respond. Trying to get A1C KS's pants off, Appellant pulled at A1C KS to get her off the desk, and A1C KS put her feet on the floor to stand up. Appellant pulled her pants and underwear down to her knees, and tried to stand between her legs as the two continued kissing. Appellant next took off A1C KS's boots and then removed her pants and underwear entirely, setting her back up on the

desk. A1C KS testified she was thinking, "I don't want this. I don't know what to do, but I don't want it." Appellant put his fingers inside A1C KS's vagina and began licking her clitoris with his tongue until A1C KS stood up, grabbed his uniform blouse around his waist, put her head on his chest, and said, "no, sir, I can't do this," to which Appellant responded, "okay." Appellant paused momentarily, then he started kissing A1C KS again, lifted her back up onto his desk, and digitally penetrated her again, stopping to undo his own belt and unbutton his pants.

Appellant pulled his penis out of his pants and began rubbing it between A1C KS's legs. A1C KS said, "don't go in me, sir, don't go in me," and Appellant responded, "I'm not going to go in you, I'm just teasing you." A1C KS testified she told Appellant not to "go in [her]" at least twice. A1C KS tried scooting her hips back away from Appellant, but Appellant grabbed her hips and pulled her towards him, and put his penis in her vagina. Appellant asked A1C KS if she "ever wanted him." Responding "no," she asked if he "ever wanted [her]," to which he said, "Yes, I've wanted this for a long time."

After a couple of minutes, someone rattled Appellant's office door handle and Appellant explained that civilians in the building check the locks. A1C KS testified, "at that point, [Appellant] just kind of freezes and he stands back up and he kind of puts his hands on his hips and he's like, can I stay here for a minute, and I'm like, okay." When asked why she told Appellant "okay," A1C KS said, "it was the only thing that came into [her] mind." With his penis still in A1C KS's vagina, Appellant told A1C KS he was sorry "for making [her] do something [she did not] want to do" and that she should "slap" him. A1C KS declined to slap him, and Appellant took her hand and "smack[ed] himself across the face." Eventually, Appellant withdrew his penis from A1C KS's vagina and stepped away, allowing A1C KS to get off the desk and put her clothes back on.

Trial counsel asked A1C KS what was going on in her head while Appellant was penetrating her with his penis. She said:

> My mind was blank. I wasn't thinking anything. . . . I was scared. I didn't want it. . . . It wasn't comprehending in my head. I wanted to say no. I didn't know how to say no to him. It was . . . like I wanted him to stop; but, I didn't know how to get him to stop. My body wasn't moving and my brain was turned off. I just kind of froze. . . . I told him no and he did it anyway.

Elaborating during re-direct examination, A1C KS testified:

> I knew I should fight back; but, again, he was my friend. I was an airman. He was a master sergeant. You can't fight back against that. You can't say no to that. It's drilled into your head

the very first day that you start training. You can't fight back against that. It's in you to listen to what they say.

During her cross-examination, A1C KS said Appellant had twice told her to let him know if she was uncomfortable, although she could not recall when during the encounter that second instance occurred.

A1C KS testified that—after waiting for her to get dressed—Appellant opened the door looking to see if anybody was in the hall, saying, "this never happened. We can't talk about this." Appellant walked out into the hallway and said, "you can go now," and A1C KS left the building and drove to her dormitory room.

Describing her state of mind as feeling "devastated," "scared," and "confused," A1C KS texted her friend, Staff Sergeant (SSgt) CB, "I've really done it now." Not telling SSgt CB any specifics, A1C KS arranged to meet him at a Starbucks. When asked by trial counsel what she meant by her text, A1C KS said:

> At this point, the only thing I recognized in my brain was that I had just slept with my boss; and, I didn't know . . . I didn't want it and I didn't like it and I knew it was wrong, and it wasn't what I wanted and I didn't know what to do. I just needed to talk to somebody.

At Starbucks, A1C KS did not tell SSgt CB what had happened, but based on her demeanor, SSgt CB gave A1C KS the base victim advocate's phone number, which he had found online.

The following morning, Appellant sent A1C KS a Skype message reading, "Good morning . . . are you okay?" A1C KS replied, "I think we need to talk." A1C KS told Appellant she needed to go to the Finance office, and she would stop by Appellant's office when she did. Just over half an hour later, A1C KS wrote to Appellant, "Are you OK?" He responded, "I guess . . . it all depends on how you are . . . lol," and she wrote, "I just feel really weird about it." Appellant wrote back, "Okay . . . we can talk in more detail when you swing by. I don't want to discuss to [sic] much of it on here . . . lol. I like face to face conversations." A1C KS did not send any more messages to Appellant that day. Appellant, however, sent a message more than three hours later to A1C KS saying she must be having a busy day. After another hour passed, he sent her a final message telling her the Finance office would be closed if she did not get there soon.

During A1C KS's direct examination, trial counsel asked why she asked Appellant if he was okay during the Skype conversation. A1C KS said, "He was my friend. I wanted him to be okay." She elaborated, "It wasn't registering. I knew it was wrong. I still know I didn't want it. I was sick. I was not

okay." After the Skype conversation, A1C KS said she "was a mess" and "just kind of bumbling around," so she decided to report the assault. Once she made the report, A1C KS was taken to a hospital for a sexual assault forensic examination.

Later forensic analysis found Appellant's DNA in semen in the underwear A1C KS was wearing. She subsequently requested and received a humanitarian assignment to an Air Force Base in North Dakota.

Appellant was charged with three specifications of sexual assault arising from the encounter in his office. The first specification alleged Appellant committed an assault by digitally penetrating A1C KS, the second alleged oral penetration, and the third alleged penile penetration. At trial, Appellant was acquitted of the first two specifications, but convicted of the third.

## II. DISCUSSION

### A. Subject-matter jurisdiction

We review questions of jurisdiction de novo. *United States v. Hale*, 78 M.J. 268, 270 (C.A.A.F. 2019) (citing *EV v. United States*, 75 M.J. 331, 333 (C.A.A.F. 2016)). Challenges of jurisdiction not raised at trial are not waived and may be raised for the first time on appeal. *See* Rule for Courts-Martial (R.C.M.) 907(b)(1); *United States v. Reid*, 46 M.J. 236, 240 (C.A.A.F. 1997).

Appellant argues he was convicted based on a theory of "constructive force" rather than "nonconsensual sexual activity," and his court-martial lacked subject-matter jurisdiction to consider this theory. Appellant's argument appears to be: a court-martial only has jurisdiction over charges properly referred to it; the convening authority referred a charge of sexual assault committed by causing bodily harm; Appellant was ultimately convicted not of committing sexual assault by causing bodily harm, but by employing constructive force; and because the constructive force manner of committing the offense was not referred to trial, the court-martial was without subject-matter jurisdiction to hear it. This novel, yet meritless, argument is rooted in a misapprehension of the concept of subject-matter jurisdiction within the military justice system. Such jurisdiction depends "solely on whether the accused 'was a member of the armed services at the time of the offense charged.'" *United States v. Jordan*, 29 M.J. 177, 184–85 (C.M.A. 1989) (quoting *Solorio v. United States*, 483 U.S. 435, 451 (1987)), *vacated on other grounds*, 498 U.S. 1009 (1990). General courts-martial have jurisdiction to try offenses punishable under the UCMJ. Article 18, UCMJ, 10 U.S.C. § 818. Appellant concedes he was subject to the UCMJ at the time of the offense and at the time of his trial, and Appellant does not dispute that sexual assault, punishable by Article 120, UCMJ, 10 U.S.C. § 920, is and was an offense under

the Code. There is no serious question that the court-martial that tried Appellant had jurisdiction over his offense.

Although he did not object at trial, Appellant now argues on appeal that the Government pursued a theory of constructive force at trial, alleging Appellant abused his authority as a master sergeant in order to compel A1C KS's submission to his advances. Under prior versions of Article 120, UCMJ, the theory of constructive force—a creation of military case law— covered scenarios in which abuse of position was used to coerce a victim's acquiescence to sexual conduct. *See United States v. Walker*, No. ACM 38237, 2014 CCA LEXIS 306, at *15–16, fn. 6 (A.F. Ct. Crim. App. 15 May 2014) (unpub. op.). The need to resort to this theory of culpability has generally been negated by changes to Article 120, UCMJ, as the version applicable to Appellant's case allows a sexual assault conviction when the perpetrator places the victim in fear of being subjected to a wrongful action. *See Manual for Courts-Martial, United States*, pt. IV, ¶ 45.a.(g)(7) (2016 ed.) (2016 *MCM*). To the extent the theory of constructive force remains viable under the 2016 version of Article 120, UCMJ, it requires more than disparity in rank. *See United States v. Bright*, 66 M.J. 359, 364–65 (C.A.A.F. 2008). Proving constructive force has required evidence of coercion equivalent to force, such that it creates a reasonable belief of physical injury or that resistance would be futile. *United States v. Simpson*, 58 M.J. 368, 379 (C.A.A.F. 2003). We have thoroughly reviewed the record of Appellant's court-martial, and we disagree with Appellant's contention he was either tried or convicted of committing sexual assault by using constructive force against A1C KS. No evidence was elicited that Appellant used his position to overbear A1C KS's lack of consent, and trial counsel did not argue he did so. Appellant's rank was raised in A1C KS's testimony when she explained why she felt she could not fight Appellant off, which is far afield of the suggestion Appellant employed constructive force to commit the sexual assault he was convicted of. The military judge did not provide the members any instructions on constructive force, and trial counsel did not argue the theory to the members either explicitly or implicitly. Appellant's trial focused on whether or not Appellant sexually assaulted A1C KS by causing her bodily harm; that is, by committing a sexual act upon her without her consent. Appellant's argument to the contrary is unsupported by the record and without merit.

## B. Factual and legal sufficiency

Appellant argues the evidence is legally and factually insufficient to support a conviction in this case. Appellant's multi-faceted attack on the evidence in the case boils down to four main points: there is reasonable doubt Appellant penetrated A1C KS's vagina with his penis; even if there was penetration, it was accomplished with A1C KS's consent; A1C KS has poor credi-

bility and lied about not consenting to the sexual act; and even if A1C KS did not consent, Appellant honestly and reasonably believed that she did. We are not persuaded by Appellant's claims.

### 1. Law

We review issues of legal and factual sufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

### 2. Analysis

#### a. Legal sufficiency

Appellant was convicted of a single specification of sexual assault, which required the Government to prove beyond a reasonable doubt: (1) that Appellant committed a sexual act upon A1C KS by causing penetration, however slight, of A1C KS's vulva with his penis, and (2) that Appellant did so by causing bodily harm to her. *See* 2016 *MCM*, pt. IV, ¶ 45.b.(3)(b). "Bodily

harm" is defined as "any offensive touching of another, however slight, including any nonconsensual sexual act or nonconsensual sexual contact." *Id.*, pt. IV, ¶ 45.a.(g)(3).[5] A1C KS testified that Appellant penetrated her vagina without her consent, after she told him "don't go in me." Appellant acknowledged A1C KS's lack of consent when he apologized to her, saying he was sorry "for making [her] do something [she didn't] want to do." Drawing every reasonable inference in favor of the Government, Appellant's conviction is legally sufficient.

### b. Factual sufficiency

In reviewing the factual sufficiency of Appellant's case, our fresh and impartial review of the evidence convinces us the Government proved each element of the offense beyond a reasonable doubt. There is no serious argument that Appellant did not penetrate A1C KS's vagina with his penis. Indeed, trial defense counsel conceded the point, focusing on A1C KS's conduct and statements during the penetration as evidence of either A1C KS's actual consent or Appellant's mistake of fact as to her lack of consent.

After the direct examination of the Government's expert witness who performed the DNA analysis, trial defense counsel only asked a single question: whether an analysis of the DNA evidence in this case could determine if the sexual conduct was consensual or not. On appeal, Appellant posits the fact the DNA analyst did not find any of Appellant's DNA on the swabs taken from A1C KS's vagina during her sexual assault forensic exam is evidence Appellant did not actually penetrate A1C KS with his penis. However, that analyst testified one reason for the absence of Appellant's DNA is "penetration without ejaculation." Appellant hypothesizes that if his DNA and semen were found in A1C KS's underwear, but not in her vagina, then there is reasonable doubt there was penetration. Considering that Appellant was "teasing" A1C KS by rubbing his penis between her legs before penetration, one reasonable conclusion is that Appellant deposited some amount of semen on A1C KS's legs or the exterior of her vagina which was then transferred to her underwear. No evidence was presented at trial indicating the relative likelihood of Appellant's DNA being found after sexual intercourse that would require us to impute the significance to the lack of DNA that Appellant asks us to find. A1C KS's testimony as to the penetration is sufficient for us to conclude beyond a reasonable doubt the penetration did occur.

---

[5] At trial, the military judge told the members they must find a third element: that the penetration occurred without A1C KS's consent.

Appellant's next two lines of attack are focused on his claim A1C KS lacks credibility and that she is simply lying about not consenting to the sexual encounter. Appellant claims that because he was acquitted of the specifications pertaining to digital and oral penetration, A1C KS's testimony as to her lack of consent was not credible. We disagree. A1C KS's testimony was that she was kissing Appellant and otherwise being outwardly ambiguous as to what she was consenting or not consenting to during the time of the digital and oral penetration (for example, responding "okay" when Appellant told her to tell him to stop if she was uncomfortable). However, immediately prior to the penile penetration, A1C KS explicitly said, "don't go in me," to which Appellant responded, "I'm not going to go in you, I'm just teasing you." There is nothing inherently incredible about A1C KS's testimony, and her explicit expression of lack of consent—acknowledged by Appellant—serves as a clear demarcation as to what specific conduct A1C KS did not consent to, to wit, the exact conduct Appellant proceeded to engage in and which he later acknowledged was something A1C KS did not want.

Appellant points to A1C KS saying "okay" to Appellant's request to "stay here for a minute" when someone was rattling the office door handle—leaving his penis in her vagina—as evidence of A1C KS's consent to the entire sexual encounter. We are not convinced that A1C KS's later acquiescence to an ongoing, legally completed sexual assault is evidence of her consenting to Appellant's initial penetration under the particular circumstances of this case. Once a person makes their lack of consent to a sexual act known, we know of no legal obligation for that person to repeatedly and continuously assert a lack of consent throughout an assault, and we decline to create such a requirement here. Even if we were to assume A1C KS saying "okay" indicated her consent at that moment, Appellant's offense was already complete upon his penetration of her vagina with his penis. In certain factual scenarios, later consensual sexual conduct may be some evidence that an earlier encounter was similarly consensual, but such an inference is unpersuasive in this case due to A1C KS's verbal statement of her lack of consent immediately preceding Appellant's penile penetration of her.

Appellant's suggestions that A1C KS claimed she was sexually assaulted for the purpose of getting a humanitarian assignment to North Dakota or to avoid being punished for committing adultery with Appellant are unsupported by the record. There is no evidence A1C KS was even aware of the availability of humanitarian assignments, much less that she was seeking one, prior to reporting the assault. The record is bare of any indication A1C KS was unsatisfied with her duty assignment at McConnell AFB before she was assaulted or that she wanted to be stationed elsewhere. To the contrary, evidence was elicited that A1C KS only sought reassignment due to concerns about encountering Appellant around the base after the assault. Similarly,

there is no evidence A1C KS was concerned about being punished for her conduct with Appellant. This claim is particularly unmoored from the evidence, as the only reason anyone was at all aware of the sexual conduct was because A1C KS decided to report the assault. Furthermore, A1C KS's relatively immediate reporting of the assault undermines the theory that she devised an assault claim for the purpose of avoiding punishment for conduct no one was aware of. A far more plausible explanation is that A1C KS reported she had been assaulted the day after the assault because she believed she had, in fact, been assaulted.

Regarding Appellant's mistake of fact defense, A1C KS acted in a way that could lead Appellant to honestly and reasonably believe she consented to being digitally and orally penetrated, especially in light of her saying "okay" when Appellant told her to tell him to stop if she felt uncomfortable. Appellant, however, was acquitted of those offenses. Appellant lost his ability to rely on a reasonable belief as to A1C KS's consent when she told him at least two times, "don't go in me" while he was rubbing his penis between her legs. Appellant further lost the ability to claim he honestly believed she consented when he acknowledged her lack of consent when he said, "I'm not going to go in you, I'm just teasing you." Even if we were to conclude A1C KS consented to later sexual conduct with Appellant, this later-given consent has no bearing on whether he was honestly and reasonably mistaken at some earlier point in time when he was unaware of what—if any—future consent would be given. In sum, Appellant had no valid mistake of fact claim with regard to the offense he was convicted of.

Having weighed all the evidence in the record of trial and made allowances for not having personally observed the witnesses, we find that a rational factfinder could have found Appellant guilty beyond a reasonable doubt of all the elements of sexual assault. Furthermore, we ourselves are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's conviction both legally and factually sufficient.

## C. Consent and mistake of fact instructions

Over Government objection, the military judge instructed the members on the defense of mistake of fact as to consent for all three specifications. Appellant argues for the first time on appeal that the pre-conviction presumption of his innocence was undermined by the military judge's instructions on consent and mistake of fact, because those instructions did not include examples of valid consent or valid mistakes of fact.

### 1. Law

R.C.M. 920(a) requires the military judge to provide members appropriate findings instructions. Under R.C.M. 920(c), any party may request the mili-

tary judge give particular instructions. R.C.M. 920(f) further provides that the failure to object to the military judge's instructions constitutes waiver of the objection, absent plain error. "[W]aiver must be established by *affirmative* action of the accused's counsel, and not by a mere failure to object to erroneous instructions or to request proper instructions." *United States v. Smith*, 50 M.J. 451, 455–56 (C.A.A.F. 1999) (citations and internal quotation marks omitted). An affirmative statement that an accused at trial has "no objection" generally "constitutes an affirmative waiver of the right or admission at issue." *United States v. Swift*, 76 M.J. 210, 217 (C.A.A.F. 2017) (citation omitted).

We review the adequacy of a military judge's instructions de novo. *United States v. Dearing*, 63 M.J. 478, 482 (C.A.A.F. 2006). If an accused fails to make an adequate request for an instruction or object to a proposed instruction, we review for plain error. *United States v. Payne*, 73 M.J. 19, 22 (C.A.A.F. 2014) (citations omitted). Under a plain error analysis, an appellant must demonstrate that "(1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the [appellant]." *Id.* at 23 (quoting *United States v. Tunstall*, 72 M.J. 191, 193–94 (C.A.A.F. 2013)).

"Appropriate instructions" under R.C.M. 920(a) are "those instructions necessary for the members to arrive at an intelligent decision concerning appellant's guilt." *United States v. Baker*, 57 M.J. 330, 333 (C.A.A.F. 2002) (citations omitted). In order to arrive at such an intelligent decision, the members must consider the charged offense's elements, evidence pertaining to those elements, and pertinent legal principles necessary to decide the case. *Id.* (citations omitted).

**2. Analysis**

Appellant waived this issue at trial. The military judge had required the Government and the Defense to submit proposed draft findings instructions prior to the start of trial. At the close of the evidence, the military judge convened an Article 39(a), UCMJ, 10 U.S.C. § 839, session to discuss those proposed instructions, covering such issues as what the correct elements were for the charged offenses; whether there were any lesser included offenses; whether the defense of mistake of fact should be explained to the members; and whether the military judge should instruct on the issue of consent. The parties debated whether or not the issues of mistake of fact and consent had been sufficiently raised with respect to the offense Appellant was convicted of, with the military judge ultimately concluding he would give the instructions. The military judge then provided the parties copies of his proposed instructions. When court reconvened the following morning, he asked whether either party had any "substantive objections" to the instructions. Trial de-

fense counsel answered in the negative and did not object to the instructions when they were given or at any other time prior to the court adjourning. Because the Defense directly participated in the crafting of the findings instructions, to include providing draft instructions prior to trial, meeting the Government's challenge to the proposed mistake of fact and consent instructions, and finally stating he had no substantive objections to the final proposed instructions, Appellant has not just forfeited his now-claimed error—he has affirmatively waived it.

Recognizing the incongruity of R.C.M. 920(f)'s position that an issue can be waived and yet still be reviewable for plain error, we have considered whether or not the military judge's instructions amounted to plain error based on Appellant's claim, and we conclude they do not.[6]

Appellant does not explain with any specificity what he perceives to be incorrect about the military judge's instructions, only generally arguing that, "giving examples of lack of consent without concurrently giving examples of consent gives an unfair advantage to the Government." Appellant's claimed error with regard to the mistake of fact defense is even more vague, as he simply asserts: "the military judge only instructed on the definition of an honest and reasonable mistake of fact regarding consent, without providing any examples of such."

Due to Appellant's failure to clearly state his claim on appeal, we are unclear as to what specifically Appellant is complaining of and what he believes the military judge should have done. Regarding the issue of consent, the military judge instructed the members:

> Consent means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent, through words or conduct, means there is no consent. Lack of verbal or physical resistance or submission resulting from the use of force, threat of force, or placing another person in fear does not constitute consent. A current or previous dating or social or sexual relationship by itself or the manner of dress of the person involved with the accused in the conduct at issue shall not constitute consent. Lack of consent may be inferred based on the circumstances. All the surrounding circumstances are to be considered in determining whether a person gave consent.

---

[6] *See, e.g., United States v. Davis*, 76 M.J. 224, 229–30 (C.A.A.F. 2017).

> The government has the burden to prove, beyond a reasonable doubt, that consent to the physical acts did not exist. Therefore, to find the accused guilty of the offenses of sexual assault, as alleged in the specifications of the charge, you must be convinced, beyond a reasonable doubt, that [A1C KS] did not consent to the physical acts.

> The evidence has raised the issue of whether [A1C KS] actually did consent to the sexual conduct at issue in all of the specifications. All of the evidence concerning consent to that sexual conduct is relevant and must be considered in determining whether the government has proven the elements of the offenses, beyond a reasonable doubt. Stated another way, evidence the alleged victim consented to the sexual conduct, either alone or in conjunction with the other evidence in this case, may cause you to have a reasonable doubt as to whether the government has proven every element of those offenses.

The first paragraph of the military judge's instructions are taken verbatim from the *Manual for Courts-Martial*. 2016 *MCM*, pt. IV, ¶ 45.a.(g)(8). Our superior court has recently endorsed these same instructions. *United States v. McDonald*, 78 M.J. 376, 378–79 (C.A.A.F. 2019). This instruction explains what the Government must prove in order for Appellant to be convicted of sexual assault and provides examples of what does not amount to valid consent. Contrary to Appellant's claims, the provision does explain—in the very first sentence and in common sense terminology—what amounts to consent under the law: "a freely given agreement to the conduct at issue by a competent person." The provision then explains that acquiescence compelled through violence or fear is inadequate to form legal consent and that the members may not infer consent from existing or past relationships, two issues likely to lead members to considerations of irrelevant matters. Not only did the military judge's instructions accurately state the law, they provided the members a basic framework for analyzing the evidence without placing undue emphasis on matters that might steer the members towards one party's position or the other's. Moreover, the military judge highlighted four times in the three paragraphs' worth of instructions that the Government had the burden to prove lack of consent and that the members must consider all evidence relevant to consent. We find no error, plain or otherwise, with respect to the military judge's instructions as to consent in this case.

Appellant's asserted error regarding the military judge's instruction on mistake of fact is without merit. The instruction, which largely tracks R.C.M. 916(j), contains no examples of what would amount to (or fail to amount to) a valid mistake of fact. Rather, the military judge explained that if Appellant

honestly and reasonably believed A1C KS consented to the sexual acts, that would be a defense, but the defense would fail if Appellant did not both honestly and reasonably believe she consented. This was an accurate and appropriate instruction, unobjected to at trial. The military judge did not err.

## D. Permissive inference of lack of consent

Appellant next asserts that a 2012 change in the definition of consent in Article 120, UCMJ, has created a permissive inference which "undermines the presumption of innocence."

Prior to the 2012 change, consent was defined in the *Manual for Courts-Martial*, in part, as: "words or overt acts indicating a freely given agreement to the sexual conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent." *Manual for Courts-Martial*, *United States*, pt. IV, ¶ 45.a.(t)(14) (2008 ed.) (2008 *MCM*). As noted above, the definition in the *Manual for Courts-Martial* applicable to Appellant's case now defines consent as: "a freely given agreement to the conduct at issue by a competent person." 2016 *MCM*, pt. IV, ¶ 45.a.(g)(8). Appellant points to a line in the Analysis of the Punitive Articles in Appendix 23 of the *Manual for Courts-Martial* which reads: "the amended definition of 'consent' allows a permissive inference of lack of consent based on the circumstances of the case,"[7] and then asserts—without evidence or citation to authority—the military is under pressure from Congress to prosecute more cases and obtain more convictions, and therefore the permissive inference "seems to be more of a mandatory inference," thereby creating a requirement for "affirmative verbal consent" in order to establish consent in a sexual assault prosecution.[8]

### 1. Law

We review the constitutionality of a statute de novo. *United States v. Disney*, 62 M.J. 46, 48 (C.A.A.F. 2005) (citations omitted). "Inferences and presumptions are a staple of our adversary system of fact-finding." *County Court v. Allen*, 442 U.S. 140, 156 (1979). "A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and

---

[7] 2016 *MCM*, App. 23, at A23–16.

[8] Appellant also incorrectly argues that later consensual sexual conduct abrogates an earlier non-consensual sexual offense under a concept of retroactive consent, a theory we reject earlier in this opinion. We acknowledge that, depending on the facts of a particular case, later consensual sexual conduct may be some evidence that prior sexual conduct between the same people was also consensual, but there is no requirement a factfinder draw such a conclusion.

common sense justify in light of the proven facts before the jury." *Francis v. Franklin*, 471 U.S. 307, 314–15 (1985) (citing *Allen*, 442 U.S. at 157–63). In contrast, the Constitution prohibits evidentiary presumptions "that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime." *Id.* at 313 (citing *Sandstrom v. Montana*, 442 U.S. 510, 520–24 (1979)) (additional citations omitted).

**2. Analysis**

We recently considered a similar permissive-inference challenge in an incapacitation sexual assault case, and there we found the appellant's argument unpersuasive, as we do here. *See United States v. Yates*, No. ACM 39444, 2019 CCA LEXIS 391, at *31–32 (A.F. Ct. Crim. App. 30 Sep. 2019) (unpub. op.). Appellant has cited no legal authority from any jurisdiction in support of his position, and we fail to see how removing the language "words or overt acts indicating" creates a requirement that a person obtain "affirmative verbal consent" before engaging in sexual conduct. What is required is that those involved in sexual conduct actually consent to that conduct, whether or not they announce that consent, verbally or in some other way. Under the earlier formulation, a freely given agreement could be established by an expression of consent through words or overt acts. Similarly, lack of consent could be established through words or conduct. Under the formulation applicable here, all relevant evidence may be considered in determining whether or not a person consented to sexual conduct, as well as whether or not an accused was mistaken as to whether that person consented or not. The removal of the phrase "words or overt acts" does not create a permissive inference, and Appellant's argument that it does is at odds with a plain reading of Article 120, UCMJ.

Appellant appears to have misapprehended the portion of the analysis of Article 120 which states that the amended definition of "consent" permits a permissive inference of lack of consent. The prior version of Article 120 essentially followed a four-part framework: (1) the definition of consent (a freely given agreement); (2) how lack of consent may be manifested (an expression of lack of consent through words or conduct); (3) examples of what does not constitute consent (lack of resistance, submission, current or previous relationship, or manner of dress); and (4) incapacity to grant consent (due to age, mental impairment, unconsciousness, mental disease or defect, or physical incapacity). *See* 2008 *MCM*, pt. IV, ¶ 45.a.(t)(14). The version of Article 120 applicable to Appellant's case largely mirrors the previous version, save some textual changes not pertinent here, with the addition of a fifth part which reads: "Lack of consent may be inferred based on the circumstances of the offense. All the surrounding circumstances are to be considered in determining whether a person gave consent, or whether a person did not resist or ceased

to resist only because of another person's actions." *See* 2016 *MCM*, pt. IV, ¶ 45.a.(g)(8)(C). It is this fifth part which creates a permissive inference, not the deletion of the phrase "words or overt acts" from the definition of what constitutes consent.

The military judge's instructions, in relevant part, mirrored the fifth part of the applicable version of Article 120 when he told the members: "Lack of consent may be inferred based on the circumstances. All the surrounding circumstances are to be considered in determining whether a person gave consent." Immediately after the military judge advised the members of this permissive inference, he reiterated that the Government had the burden to prove lack of consent beyond a reasonable doubt. He then restated this premise, telling the members that they must be convinced beyond a reasonable doubt that A1C KS did not consent before they could find Appellant guilty. Considering the permissive inference instruction's direction to assess "all the surrounding circumstances," we conclude this instruction did not serve to relieve the Government of its burden of persuasion, especially in light of the military judge's repeated emphasis that the Government bore the burden of proof as to lack of consent beyond a reasonable doubt.

Similarly, we do not find any unconstitutional burden shifting in the changes to the definition of consent in Article 120. The notion that the members may infer a lack of consent based upon all the surrounding circumstances in a case is rooted in both reason and common sense, as the definition merely states the obvious, which is that a factfinder must consider the evidence in determining whether or not a person consented to sexual conduct. At most, the change in Article 120 expanded the range of evidence available to prove lack of consent. The Government must still prove the absence of a freely given agreement, but may do so by any means and is not constrained to proving the absence of "words or overt acts" that would otherwise establish such an agreement. We identify no constitutional infirmity in the definition of consent as instructed by the military judge.

### E. Prosecutorial misconduct

In his fifth assignment of error, Appellant argues that trial counsel misstated the law during the Government's closing argument, thereby committing prosecutorial misconduct. More specifically, Appellant claims trial counsel told the members that Appellant was required to seek "affirmative consent" from A1C KS before engaging in sexual conduct with her. We disagree both with Appellant's premise and his conclusion.

#### 1. Additional Background

During A1C KS's direct examination, she recounted Appellant first penetrating her vagina with his penis. Trial counsel asked, "Did he ask you if he

could that [sic] at that point?" To which she answered, "No, sir." Trial counsel then asked, "Did he ask you if you had changed your mind?" A1C KS answered, "At this point, he is kind of asking me if I ever wanted him. I said, 'no.' I asked him if he ever wanted me and he said, 'yes, I've wanted this for a long time.'"

In closing argument, trial counsel argued, in relevant part:

> [A1C KS] knows exactly where this is heading at this point and he walks towards her with his erect penis and he starts to put it in between her legs, and she says, unequivocally, "no, sir, don't put it in me." She could not have expressed clearer language. "No, sir, don't put it in me." She said she said it several times. Did the accused hear it? Yes. How do we know? Because he said, "I won't. I'm just teasing you."

> "I won't. I'm just teasing you." Maybe this will be enough to get him to stop? "No, sir, don't put it in me; don't put it in me." And he asks, "have you ever wanted me?" And she replies, "no; no." And her reply is, "have you ever wanted me?" And he says, "for a long time," and then inserts his penis into her vagina. He didn't ask her, "can I do this now." He didn't ask her, "is it okay." He didn't say, "do you want me right now?" He was reminded, "yeah, I've wanted this for a long time; and, guess what, I'm going to take it," and he did.

> "No, sir, don't put it in me," and then he did. Members, that is not consent. She expressed that she did not consent to that. And, in fact, not only that, she expressed that she had never been interested in this. "Have you ever wanted me?" "No. Nope." And then the accused put his penis in her vagina.

Trial defense counsel did not object to either the above examination or argument.

**2. Law**

Claims of prosecutorial misconduct and improper argument are reviewed de novo, and when no objection is made at trial, these claims are reviewed for plain error. *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citation omitted).

In reviewing counsel's argument, we are mindful that arguments "must be viewed within the context of the entire court-martial." *United States v. Baer*, 53 M.J. 235, 238 (C.A.A.F. 2000). Our inquiry is focused not just on words in isolation, "but on the argument as 'viewed in context.'" *Id.* (quoting

*United States v. Young*, 470 U.S. 1, 16 (1985)). Thus, we will not "surgically carve out a portion of the argument with no regard to its context." *Id.*

### 3. Analysis

Appellant has focused on two answers provided by A1C KS during her lengthy direct- and cross-examinations, spanning more than 100 pages of the trial transcript. Appellant has similarly focused on two lines excised from the 36 pages of trial counsel's argument.

Contrary to Appellant's assertion, neither the examination of A1C KS nor trial counsel's argument suggest Appellant was required to obtain "affirmative consent" from A1C KS. Placing both in context, A1C KS had verbally expressed her lack of consent to Appellant penetrating her with his penis, and Appellant had acknowledged her lack of consent. Appellant then proceeded to penetrate her. Trial counsel's questions during A1C KS's direct examination established that A1C KS had not expressed consent and that Appellant had not attempted to persuade her to change her mind. During closing argument, trial counsel revisited this evidence to argue to the members not only had A1C KS not consented to the sexual conduct, but that Appellant did not have either an honest or reasonable mistake as to her lack of consent.

The Government had the burden of proving both A1C KS's lack of consent and disproving Appellant's mistake of fact defense regarding that lack of consent beyond a reasonable doubt. Proving that A1C KS had not given verbal consent to the sexual conduct at the time of penetration was a legitimate—if not necessary—trial strategy. As explained above, A1C KS's lack of consent could be established by "all the surrounding circumstances," and the fact she did not tell Appellant he could penetrate her with his penis is a pertinent fact in making that determination. Similarly, the fact she did not give verbal consent calls into question whether Appellant's claimed mistake of fact was either honest or reasonable. At a minimum, what A1C KS did or did not say during the assault is a "surrounding circumstance" trial counsel was entitled to elicit and the members were entitled to consider in assessing A1C KS's consent.

At no point in the court-martial did trial counsel argue Appellant was required to obtain A1C KS's affirmative verbal consent before engaging in sexual conduct with her. A conclusion that the above excerpts suggested to the members such affirmative consent was required is a far leap we are unwilling to make on the basis of the case before us.

Assessing these brief references in context of the entire trial, we find no error. Even considering these statements in isolation, we find no error, much less plain error.

**F. Sentence appropriateness**

Appellant's sixth assignment of error is that his sentence is inappropriately severe. Appellant faced a maximum sentence of a dishonorable discharge, confinement for 30 years, forfeiture of all pay and allowances, reduction to the grade of E-1, and a reprimand. 2016 *MCM*, pt. IV, ¶ 45.e(2). Due to his conviction for sexual assault, a sentence to a dishonorable discharge was mandatory under Article 56(b), UCMJ, 10 U.S.C. § 856(b). Appellant's approved sentence consists of a dishonorable discharge, confinement for six years, and reduction go the grade of E-1.

Appellant was charged with three specifications of sexual assault under Article 120, UCMJ, all arising from the events in Appellant's office on 13 March 2017 between him and A1C KS. Appellant was acquitted of the two specifications alleging digital and oral penetration, but convicted of the specification alleging penile penetration. Appellant argues that his sentence was possibly the result of the members punishing him for the entire sexual encounter, including the acts of which he was acquitted. He argues this risk arises from the military judge's instruction to the members to consider "all the facts and circumstances of the offense of which the accused has been convicted." He further argues his sentence is excessive "for one sexual assault conviction," especially in light of Appellant's 21-year career and multiple overseas deployments.

**1. Law**

We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). Our authority to determine sentence appropriateness "reflects the unique history and attributes of the military justice system, [and] includes but is not limited to considerations of uniformity and evenhandedness of sentencing decisions." *United States v. Sothen*, 54 M.J. 294, 296 (C.A.A.F. 2001) (citations omitted). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(c), UCMJ, 10 U.S.C. § 866(c). This includes the authority to disapprove a mandatory minimum sentence under Article 56, UCMJ, 10 U.S.C. § 856. *United States v. Kelly*, 77 M.J. 404, 408 (C.A.A.F. 2018). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense, the appellant's record of service, and all matters contained in the record of trial." *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (citations omitted). Although we have great discretion to determine whether a sentence is appropriate, we have no power to grant mercy. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010) (citation omitted).

### 2. Analysis

We are unconvinced that the members adjudged an inappropriately severe sentence or that they were improperly instructed. First, the military judge instructed the members to consider the facts and circumstances of the offense *of which Appellant was convicted*. Thus, the members were properly instructed. We presume court members follow instructions by a military judge, unless we have evidence to the contrary. *United States v. Stewart*, 71 M.J. 38, 42 (C.A.A.F. 2012) (citation omitted). Appellant has identified no such evidence, and his claim the members did not follow the military judge's instructions amounts to mere conjecture. Considering that the panel which sentenced Appellant was the same panel which had convicted Appellant of one specification and acquitted him of the other two specifications less than an hour earlier, we find it highly unlikely the panel members were confused about the limits of their discretion.

We conclude the panel made a deliberate determination to convict Appellant of the one specification, and the military judge's instructions did not lead the panel to enhance Appellant's sentence or otherwise penalize Appellant solely because the Government had charged him with two other offenses the panel had just acquitted him of.

We are also not persuaded the acquitted-of offenses posed any plausible risk of enhancing Appellant's punishment simply by virtue of having been charged as offenses. Those two offenses consisted of Appellant's alleged non-consensual digital and oral penetration of A1C KS, occurring immediately prior to the penile penetration he was convicted of. In other words, all three charged sexual assaults were components of the overall sexual encounter in Appellant's office. Despite the panel's acquittal of the first two offenses, the conduct underlying those offenses—that is, the digital and oral penetration—amounts to facts and circumstances surrounding and immediately preceding the convicted-of offense, and therefore was available to the panel for consideration in arriving at a sentence.

We also disagree that Appellant's sentence is inappropriately severe. Appellant, a senior noncommissioned officer with at least two decades of active-duty service, sexually assaulted a junior Airman who had been at her first permanent duty station for only seven months. He did so at work, on his desk, while in uniform, after using his Government computer to arrange their meeting. Appellant penetrated A1C KS's vagina with his penis after she told him not to, then later joked about how he made her do something she did not want to. Appellant faced 30 years of confinement, but was sentenced to only 6 years, along with a mandatory dishonorable discharge and reduction to the grade of E-1. We considered Appellant; the nature and seriousness of the offense; his long record of military service; his prior record of misconduct; and

all matters he submitted in his case in extenuation, mitigation, and clemency. We conclude the approved sentence, including the dishonorable discharge, is not inappropriately severe.

## G. Constitutionality of a mandatory dishonorable discharge

Appellant's seventh assignment of error claims that Congress' establishment of a mandatory punishment of a dismissal or dishonorable discharge for an accused convicted of sexual assault in violation of Article 120(b), UCMJ, violates the Eighth Amendment's[9] prohibition against cruel and unusual punishment "and/or" the Fifth Amendment's[10] guarantee of due process in receiving individualized consideration for sentencing. Appellant specifically focuses on the fact that he was eligible for retirement and—by virtue of divesting him of his retirement—his punishment was all the more severe. Despite the indisputable severity of a dishonorable discharge, we disagree with Appellant's claim of unconstitutionality.

### 1. Law

We review the constitutionality of a statute de novo. *Disney*, 62 M.J. at 48 (citations omitted).

The sentence of an accused found guilty of, *inter alia*, sexual assault in violation of Article 120(b), UCMJ, "shall include dismissal or dishonorable discharge, as applicable." Article 56(b), UCMJ, 10 U.S.C. § 856(b).

### 2. Analysis

The United States Supreme Court has rejected the argument that the Eighth Amendment bars mandatory punishments for adult offenders with the exception of the death penalty. *See Harmelin v. Michigan*, 501 U.S. 957, 994–95 (1991) (upholding mandatory sentence to confinement for life).[11] "There can be no serious contention, then, that a sentence which is not otherwise cruel and unusual becomes so simply because it is 'mandatory.'" *Id.* at 995 (citation omitted); *see also United States v. Curtis*, 44 M.J. 106, 157 (C.A.A.F. 1996) (quoting *Harmelin*, 501 U.S. at 994–95).

Appellant argues a mandatory sentence to a dishonorable discharge for a service member who is retirement eligible is analogous to the death penalty. This comparison warrants no extended discussion. We note that while a dis-

---

[9] U.S. CONST. amend. VIII.

[10] U.S. CONST. amend. V.

[11] Mandatory life without parole has been rejected for juvenile offenders. *See Miller v. Alabama*, 567 U.S. 460 (2012).

honorable discharge may terminate Appellant's military status, it does not end his life.

An accused does have the right to have his or her sentence determined by "'individualized consideration' . . . 'on the basis of the nature and seriousness of the offense and the character of the offender.'" *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982) (quoting *United States v. Mamaluy*, 27 C.M.R. 176, 180–81 (C.M.A. 1959)). This does not prohibit Congress from establishing a minimum (or maximum) punishment for a given offense, as those limits indicate congressional determination of lower and upper limits of punishment appropriate for a given offense. In Appellant's case, while he was still subject to a dishonorable discharge, the members were at liberty to sentence him to confinement ranging from no confinement to 30 years of confinement. That is, even with a mandatory punitive discharge, the sentencing authority had great latitude to make an individualized determination as to an appropriate sentence in Appellant's case.

A dishonorable discharge is an unquestionably severe punishment with significant impacts and a long-lasting stigma. *See United States v. Mitchell*, 58 M.J. 446 (C.A.A.F. 2003). The offense of sexual assault is also serious and can result in life-altering impacts for the victims as well as devastate good order and discipline within military ranks, especially when the perpetrator and victim are both military members, as is the case here. A mandatory punitive discharge is well within the range of minimum punishments Congress could rationally establish with respect to the offense of sexual assault.

Considering congressional legislation is also the source of military retirement benefits, we can safely assume Congress considered the loss of retirement pay as a consequence when the minimum sentence relevant here was enacted. We are not persuaded Appellant's eligibility for retirement changes the calculus, as a dishonorable discharge would deprive any enlisted member of his or her military rights and benefits, regardless of what stage of their career they are at. If anything, a person with Appellant's lengthy service should have had a greater awareness of just what he stood to lose by committing such a serious offense and conducted himself accordingly. We do not see a reason why a military member should receive a different sentence simply by virtue of whether he or she commits offenses before or after passing the 20-year service mark.

### H. Member challenge

Appellant asserts the military judge erred by denying the Defense's challenge for cause against Captain (Capt) AO, one of the members on Appellant's court-martial. Within this assertion, Appellant argues the military judge should have not only granted the challenge, but also excused Capt AO

when he purportedly had difficulty staying awake during expert witness testimony. The latter argument pertains to whether or not Capt AO should have been removed from the court-martial mid-trial, while the former pertains to whether he should have been permitted to serve on the court at all. We will address these two arguments in turn.

### 1. Additional Background

Capt AO, a military pediatrician, explained during voir dire that due to his position, he had "been acquainted with multiple individuals over a number of years who have been victims of sexual assault." In fact, when the military judge asked him, "when was the last time it crossed your mind, oh, I know someone who's been a victim of sexual assault?" Capt AO answered, "earlier today." Capt AO clarified this was pursuant to his treatment of a patient, "through [his] professional interactions," later stating he had personally seen 20 to 30 child sex-abuse victims as patients during his time as a military physician.

Capt AO had not been trained to conduct sexual assault exams, nor had he been involved with any such exams of adult patients, but he had received "some minimal training in specifics in regards to the sexual assault exam process" with respect to child victims during a course on child abuse.

When asked by the military judge whether he was concerned about his ability to be fair and impartial in participating in Appellant's case, Capt AO responded he was not. Capt AO went on to explain he had "seen many sides of victims, perpetrators, individuals, and families" based upon him being a mandatory reporter for child abuse and neglect, as well as being a new foster parent of children who "potentially have been victims of that." Commenting on his obligation to report child abuse, Capt AO said he "take[s] that very seriously to include trying to be as objective as possible in regards to that concern." He added he felt he had experience being able to take in information presented in various settings with an open mind and weighing it "without passing judgment immediately," and he believed he could be fair and impartial regarding Appellant's case. In responding to questions from trial counsel, Capt AO said he would listen carefully to and follow the military judge's instructions, and he could set aside his practice experiences and focus on the evidence presented in court.

In response to trial defense counsel's question about how often sexual assault "pops into [his] memory," Capt AO said, "lately . . . the topic is fairly frequent" due to media coverage combined with military officers' obligations

to stay abreast of current events. Capt AO identified the #MeToo movement,[12] "the U.S.A. gymnastics team physician, Michigan State, all that," as issues he was aware of, explaining that this awareness does not impact his judgment about accusations "because . . . you know, people are innocent until proven guilty and there are situations of false accusations for any number of reasons."

Trial defense counsel challenged Capt AO for cause under a theory of implied bias based upon Capt AO's professional exposure to sexual assault victims as a pediatrician, his potential exposure to victims as a foster parent, his specialized training in sexual assault, and his familiarity with sexual assault forensic examinations. The military judge denied trial defense counsel's challenge, finding an absence of actual bias based on Capt AO's assertions he would be willing to listen to, consider, and evaluate all the evidence in the case, even though Appellant had not objected on actual-bias grounds. Regarding the theory of implied bias, the military judge recognized the liberal grant mandate for defense challenges. He highlighted Capt AO's professional experience with sexual assault being limited to child victims and Capt AO's superficial exposure to forensic examinations, concluding that "[a] member of the public, looking in, would not harbor any concerns about the fairness of this process under those circumstances and would have great confidence that [Capt AO] would be fair and impartial in making a determination as to whether the government has met its burden."

During the afternoon of the first day of testimony, the Government called an expert witness to testify about the forensic analysis of certain items of evidence in the case. Near the end of the Government's direct examination of this witness, the military judge interrupted the examination and took a ten-minute recess, during which the military judge met with counsel for an R.C.M. 802 conference. After the recess, counsel for both sides finished questioning the witness, and the Government rested. The military judge then convened an Article 39(a), UCMJ, session outside the presence of the members. During this session, the military judge summarized the R.C.M. 802 conference:

> I'm watching the witness, watching counsel, watching the gallery, taking notes, watching the members and during the course of watching the members, I observed that a couple of them were having a little bit of trouble. It's the afternoon lull.

---

[12] For a discussion of the #MeToo movement, *see generally*, Elizabeth C. Tippett, "The Legal Implications of the MeToo Movement," 103 Minn. L. Rev. 230 (2018).

> The testimony . . . it's not a criticism, [the witness] just is scientific evidence, which can be sometimes less than enthralling. And, so, I called a break to make sure that the members would have a chance to stretch their muscles and get some coffee if they needed to and called counsel in and just made sure that they were looking at the same thing I was; and, if they had any concerns to bring it up. And, I think counsel were satisfied that we were okay at that stage; but, they had noticed the same thing that the court had noticed. So, then, I told the bailiff to encourage the members to get some coffee, get some drinks, do whatever they needed to . . . stay with us this afternoon; and, I observed them through the rest of [the witness'] testimony and it feels like that break remedies the court's concerns.

Neither party objected to this summary or supplemented it with any additional information. No specific members were named. The military judge asked whether either party had any issues or concerns with the members tracking the evidence, and both responded in the negative.

### 2. Law

Under R.C.M. 912(f)(1)(N), members shall be excused for cause if they "should not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." We employ an objective standard to evaluate a military judge's ruling on a challenge for implied bias. *United States v. Strand*, 59 M.J. 455, 458 (C.A.A.F. 2004). Implied bias is "viewed through the eyes of the public, focusing on the appearance of fairness." *United States v. Bagstad*, 68 M.J. 460, 462 (C.A.A.F. 2010) (quoting *United States v. Clay*, 64 M.J. 274, 276 (C.A.A.F. 2007)). We will find implied bias "when most people in the same position as the court member would be prejudiced." *United States v. Elfayoumi*, 66 M.J. 354, 356 (C.A.A.F. 2008) (citations omitted).

"Neither law nor logic demands that a court-martial be detailed with members devoid of the common experiences of mankind," and members are not disqualified simply by virtue of personally working with victims of crimes similar to those charged. *United States v. Towers*, 24 M.J. 143, 145–46 (C.M.A. 1987). Moreover, the fact a member is in a profession that is shared by an expert witness does not call for the disqualification of a member, unless the member demonstrates bias "resulting from or inseparable from" that professional experience. *United States v. Ovando-Moran*, 48 M.J. 300, 303 (C.A.A.F. 1998) (citing *Towers*, 24 M.J. at 146).

Military judges must follow the "liberal grant mandate" when considering challenges for cause made by the defense to ensure service members are tried

"by a jury composed of individuals with a fair and open mind." *United States v. James*, 61 M.J. 132, 139 (C.A.A.F. 2005) (quoting *United States v. Smart*, 21 M.J. 15, 18 (C.M.A. 1985)). We will not overturn a military judge's denial of a challenge absent a clear abuse of discretion in applying the liberal-grant mandate. *United States v. White*, 36 M.J. 284, 287 (C.M.A. 1993). When a military judge "considers a challenge based on implied bias, recognizes his duty to liberally grant defense challenges, and places his reasoning on the record, instances in which the military judge's exercise of discretion will be reversed will indeed be rare." *Clay*, 64 M.J. at 277.

### 3. Analysis

Having reviewed all the questions put to Capt AO and his answers, we conclude the military judge did not abuse his discretion in denying the Defense's challenge for cause against him. Appellant points to Capt AO's work with child sexual assault victims and his awareness of widely reported sexual assault issues as being disqualifying. Appellant does not advance a rationale as to why these facts would disqualify a member from serving on an adult sexual assault court-martial, and we identify none.

When asked about his experience with allegations of child sexual abuse, Capt AO discussed how it was his practice to approach such allegations with an open mind and to refrain from passing immediate judgment. Capt AO's discussion on this point highlighted his appreciation of the significance of making a reasoned determination about such serious allegations and not jumping to conclusions, the precise perspective we expect of all court members. Capt AO did not indicate that he was predisposed to believe allegations of sexual assault, nor did he offer an opinion as to the general veracity of claims of assault. He did not say his treatment of child victims would factor into his assessment of the evidence in Appellant's trial at all, much less lead him to reject or overemphasize any particular evidence. Capt AO answered the questions from counsel and the military judge thoroughly, and he said he would set aside his personal experiences and focus on the evidence produced in Appellant's court-martial. Capt AO's experience with respect to child victims of sexual abuse does not serve to render him ineligible to be a member in an adult sexual assault case, and his service does not give rise to any substantial doubt as to the legality, fairness, and impartiality of Appellant's trial.[13] Based upon the totality of the above factual circumstances, we find no

---

[13] *See, e.g., United States v. Ovando-Moran*, 48 M.J. 300, 301–04 (C.A.A.F. 1998) (medical doctor who had treated sexual assault victims was not disqualified from rape case); *United States v. Daulton*, 45 M.J. 212, 217 (C.A.A.F. 1996) (physician who had worked in emergency room and who had to determine whether child patients had

*(Footnote continues on next page)*

risk that the public would perceive Capt AO's participation as a member as rendering Appellant's trial less than fair. The military judge did not abuse his discretion in denying the Defense's challenge for cause.

With respect to Capt AO's awareness of the #MeToo movement and cases covered in the national media, we note the media coverage Capt AO referred to was not of Appellant's particular case. Capt AO did not say that coverage had led him to think about sexual assault allegations in any particular way or that it would shade his assessment of the evidence in Appellant's case. Questioning did not reveal similarities between Appellant's case and those in the media, rendering the connection between Appellant's case and the reports exceedingly tenuous. Even if such similarities existed, we have never required court-martial members to be completely unaware of current events with passing similarities to the case before them, and we decline to do so now.[14] It should go without saying that military members are expected to stay abreast of current events, and absent a more specific connection to Appellant's trial, Capt AO's awareness of those events do not serve to disqualify him from service as a court-martial member.

Appellant's argument Capt AO should have been excused when he failed to stay awake during trial is meritless. There is no evidence in the record of trial, and Appellant has provided none on appeal, that would allow us to conclude Capt AO was not adequately paying attention to testimony. All that is in the record is the military judge's summary of the R.C.M. 802 conference wherein he notes "a couple of [the members] were having a little bit of trouble. It's the afternoon lull." Not only does the summary fail to identify Capt AO as having any particular difficulty paying attention, it does not indicate any member was actually sleeping, or for how long the members the military judge was referring to "were having . . . trouble." What the record does indicate is that neither side asked for testimony to be revisited for the members, and both parties indicated they were satisfied with the military judge's

---

been abused was not disqualified from indecent acts with a child case); *United States v. Towers*, 24 M.J. 143, 144–46 (C.M.A. 1987) (former child welfare counselor who had investigated more than 100 cases of alleged child abuse and testified in at least 25 cases was not disqualified from indecent acts with a child case).

[14] *See, e.g., United States v. Bischoff*, 74 M.J. 664 (A.F. Ct. Crim. App. 2015) (knowledge of another trial pertaining to the same type of offense not disqualifying). Even possessing some knowledge of the particular case being tried is not *per se* disqualifying. *See, e.g., United States v. Rockwood*, 52 M.J. 98, 106 (C.A.A.F. 1999) (citation omitted); *United States v. Napoleon*, 46 M.J. 279, 283 (C.A.A.F. 1997) (citations omitted).

remedy: a short break. Appellant would have us infer from the military judge's summary that Capt AO was sleeping during trial and the military judge should have *sua sponte* removed him from the court-martial. Based on the record before us, we decline to do so.

## III. CONCLUSION

The findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court